UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
               :

SCOTTSDALE INSURANCE CO.,          :
               :
         Plaintiff,        :
               :
               :         19-cv-7477 (LJL)
     -v-          :
               :     OPINION AND ORDER

PATRICK M. MCGRATH, AH DB KITCHEN  :
INVESTORS LLC, and CASTLEGRACE EQUITY :
INVESTORS, LLC,           :
               :
         Defendants.     :
               :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Scottsdale Insurance Company ("Scottsdale") moves, pursuant to Fed. R. Civ. P.

Rule 56, for summary judgment on its claims for declaratory judgment and on the counterclaims

asserted against it by Defendant Patrick McGrath ("McGrath").  For the following reasons, the

motion is denied.

## BACKGROUND

### A.    Relevant Parties

      Scottsdale is the insurer on Business and Management Indemnity Policy number

EKS3172343, Dkt. No. 1-1 (the "Watershed Policy"), issued to Watershed Ventures, LLC

("Watershed").  The Watershed Policy affords, subject to its terms, conditions, and exclusions,

Directors and Officers and Company Coverage ("D&O Coverage").

      Patrick McGrath ("McGrath") is an individual.

The dispute concerns a failed restaurant that was to be opened in Aspen, Colorado by a joint venture, Rocky Aspen, LLC ("Rocky Aspen"), whose members were Rocky Aspen Management 2014, LLC ("RAM 204"), a wholly owned subsidiary of Watershed, and AH DB Kitchen Investors LLC ("AH DB"), a Delaware limited liability company.  AH DB's sole member is Aristone Hospitality LLC ("Aristone").  McGrath is the sole member of Aristone. McGrath also is the sole member of Castlegrace Equity Investors, LLC ("Castlegrace"), a Delaware limited liability company.

 The present motion presents the question of whether McGrath—who was a co-manager of Rocky Aspen until January 5, 2016—is an insured under the Watershed Policy ("Insured") and entitled to coverage for claims brought against him stemming from the failure of Rocky Aspen in the period between March 26, 2015 and January 5, 2016.

### B.      Pertinent Policy Provisions

The Watershed Policy, which had a policy period from November 6, 2015 to November 6, 2016, covers Watershed, its subsidiaries, and their directors and officers.

Under the Watershed Policy, "Company" is defined as the "Parent Company" (*i.e.*, Watershed) and any "Subsidiary".  *See* Watershed Policy, General Terms and Conditions § B(2).

"Subsidiary," in turn, is defined as:

a.  Any entity of which more than fifty percent of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly, if such entity

    i.   was so owned on or prior to the inception date of this Policy; or

    ii.   becomes so owned after the inception date of this Policy; and

b.  any joint venture entity in which the Parent Company, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the Parent Company or entity described in a.  above solely controls the management and operations of such joint venture entity.

*Id.*, General Terms and Conditions § B(11)

The D&O Coverage section of the Watershed Policy defines "Directors and Officers" in pertinent part as any person who was, now is, or shall become "a duly elected or appointed director, officer, or similar executive of the Company, or any member of the management board of the Company." *Id.*, D&O Coverage, § B(4).

The term "Insured" is defined by the D&O Coverage Section as including the Company and Directors and Officers. *Id.*, D&O Coverage § B(5).

The term "Wrongful Act" is defined by the D&O Coverage Section in pertinent part as:

> Any actual or alleged error, omission, misleading statement, misstatement, breach of duty or act allegedly committed or attempted by:
>
> > a. any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any of the Directors and Officers solely by reason of his or her serving in such capacity. . . .

*Id.*, D&O Coverage, § B.9.  The D&O Coverage Section excludes coverage for:

> Loss . . . on account of any Claim:
>
> > h. against any of the Directors and Officers of any Subsidiary or against any Subsidiary alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed or attempted by a Subsidiary or Directors and Officers thereof:
> >
> > > i. before the date such entity became a Subsidiary or after the date such entity ceased to be a Subsidiary; or
> > >
> > > ii. occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring before the date such entity became a Subsidiary, would constitute Interrelated Wrongful Acts; . . .

*Id.*, Exclusions § C(1)(h).

### C.     Rocky Aspen LLC

Rocky Aspen was formed on or about April 24, 2013 by RAM 204 and AH DB.  The purpose of Rocky Aspen was to open and operate a "full service, first class, upscale, cocktail

lounge" and "full service, high quality, fine dining, restaurant, maintaining standards consistent with other restaurants of Watershed Ventures LLC" in Aspen, Colorado,. Dkt. No. 47-1 § 2.2.

The relevant agreement is the Second Amended and Restated Limited Liability Company Agreement, dated March 20, 2015. *See* Dkt. No. 38-1, Second Amended and Restated Limited Liability Company Agreement ("Operating Agreement"). Under that agreement, AH DB and RAM 204 were the sole members of Rocky Aspen, with AH DB and RAM 204 each owning fifty percent of the company by voting percentage interest. Operating Agreement, Schedule 5.1. RAM 204 was to act as the initial manager of the restaurant and AH DB was to contribute capital. *Id*. § 3.6. AH DB contributed $4,220,000 to the joint venture and RAM 204 contributed in-kind a license to use the Watershed brand and conceptual design with a fair market value of $4,000,000. *Id*., Schedule 5.1. RAM 204 did not contribute cash. *Id.* In return, each received 500 economic units ("Economic Units") in the joint venture and 500 voting units ("Voting Units") in the joint venture. *Id.* The Operating Agreement set a benchmark date of March 25, 2015 for the opening to the public of the restaurant and lounge and additional capital contributions required to be made by AH DB. *Id.* § 2.7. In particular, AH DB was required to make capital contributions in the amounts of $3,282,879.80 ("Committed Additional Aristone Capital Contribution") and $1,175,200 ("Pre-Opening Additional Aristone Capital Contribution") less certain amounts paid to Rocky Aspen or reduction of amounts owed by Rocky Aspen. *Id*. § 5.2(b).

If those deadlines and other conditions were met, AH DB was entitled to receive additional economic (*i.e.*, non-voting) interests in Rocky Aspen. *Id*. § 2.5. If AH DB failed to make the Committed Additional Aristone Capital Contribution before the earlier of March 25, 2015 or seven days prior to the anticipated opening of the restaurant and lounge, or failed to

make the Pre-Opening Additional Aristone Capital Contribution on the earlier of March 25, 2015

or seven days prior to the anticipated opening of the restaurant and lounge, or if the restaurant

and lounge were not presented to RAM 204 consistent with the Watershed brand on or prior to

March 25, 2015 (all considered to be "Watershed Option Triggering Events"), the so-called

Watershed Option ("Watershed Option") was triggered.  *Id*. § 2.7.  The Watershed Option

entitled RAM 204 to purchase 9,000 additional Economic Units and 9,000 Voting Units at a

price equal to $33.33 for both one Economic Unit and one Voting Unit.  The Watershed Option

was exercisable immediately upon and at all times following a Watershed Option Triggering

Event.  *Id*. § 2.7

  Under the Operating Agreement, "management of the Company and the right to bind and

exercise the other powers of the Company is vested exclusively in the Co-Managers."  *Id*. § 3.1;

*see also id*. § 4.1.  Each of AH DB and RAM 204 would appoint a co-manager "who together

[would] be responsible for the day-to-day operational decision making of the Company."  *Id*.

§ 3.2(a).  The persons designated as co-managers were to serve until the earlier of the person's

death, disability, bankruptcy, dissolution, resignation, or removal and were not subject to

periodic elections.  *Id*. § 3.2(a).  Moreover, with a single exception, the co-manager appointed by

each of AH DB and RAM 204 could be removed only by the member who appointed that co-

manager (with the right of the member then to select a replacement).  McGrath was appointed by

AH DB as a manager.

  The single exception—important here—was that "[i]f the Watershed Option becomes

exercisable (for avoidance of doubt, regardless of whether the Watershed Option actually

exercised [sic]), [AH DB] shall no longer have the right to appoint, remove and/or replace a Co-

Manager, in which case the Watershed Member shall have the sole right to appoint, remove and

replace Co-Managers." *Id*. § 3.6.  In addition, if the Watershed Option becomes exercisable then AH DB "shall immediately forfeit 100% of its Voting Units without being paid any consideration therefor." *Id*. § 5.2(b).

The co-managers have the authority to keep the accounting books and records of Rocky Aspen, *id*. § 8.1, to prepare and deliver annual financing statements, *id*. § 8.2, and to make non-liquidating distributions to the Members but the order, priority and manner of those distributions is strictly prescribed, *see id*. Art. VII.  If, in the course of their management and operation of Rocky Aspen, the co-managers are unable to agree on a course of action with respect to one or more matters or issues of importance to the company and the inability to agree may materially and adversely affect the ability of the company to operate effectively, then either co-manager may give notice that a deadlock has occurred and one or more of the members may attempt to replace the co-managers pursuant to the agreement.  *Id*. § 3.7.  If the deadlock cannot be resolved through replacement of a co-manager, then the Members agree to seek a buyout of the Units of one member by the other and, assuming no such agreement can be reached, agree to binding arbitration.  *Id*.

The rights of the members themselves were limited under the Operating Agreement.  As noted above, the co-managers were not subject to periodic elections and had sole operating and managerial authority.  The Operating Agreement provides:

No Member may (i) take part in, or interference in any manner with, the management, conduct or control of the business or affairs of the Company other than, in the case of a Member, granting or withholding that Member's Approval with respect to any action to be taken by the Members hereunder or (ii) take any action to bind or otherwise act for or on behalf of the Company.

*Id*. § 4.1.

### D.    The Rocky Aspen Bankruptcy

It is undisputed that AH DB failed to satisfy its funding obligations to Rocky Aspen by March 25, 2015, the date specified in the Operating Agreement.  Thus, by operation of the Operating Agreement, by March 26, 2015, AH DB automatically forfeited 100% of its Voting Units in Rocky Aspen and the Watershed Option became exercisable.

On January 5, 2016, RAM 204 exercised the Watershed Option and purchased an additional 9,000 membership units of Rocky Aspen.  Dkt. No. 46 ¶ 9.  The letter asserted that Watershed Triggering Events had occurred and purported to remove McGrath as a co-manager of Rocky Aspen.  Dkt. No. 14-3.

On or about March 11, 2016, Rocky Aspen—then solely managed by RAM 204—filed for Chapter 7 bankruptcy.  Dkt. No. 46 ¶ 9.  On or about April 18, 2016, Jared C. Walters, the Chapter 7 Trustee in the Bankruptcy Action, filed an Adversary Proceeding against Castlegrace in the Bankruptcy Action.  *Id* ¶ 12.  On or about May 11, 2018, the Trustee filed an Adversary Proceeding against AH DB and McGrath in the Bankruptcy Action ("Adversary Proceeding"). *Id*. ¶ 13.  The Adversary Proceedings allege that Rocky Aspen has been damaged as a result of two monetary transfers that were allegedly made on July 31, 2015 in connection with certain loans made to or for the benefit of Defendants.  *Id*. ¶ 14.[1]  On or about June 7, 2019, counsel for

---

[11] The details of the allegations in the Adversary Proceedings and the allegations in other litigation involving some of the same parties here that has arisen out of failed Rocky Aspen venture, *see* Dkt. No. 46 ¶¶ 18-19, are not relevant to disposition of the instant motion.

the Trustee sent a letter to McGrath's counsel demanding that he and AH DB pay a particular

sum in order to resolve the Adversary Proceedings.

On June 7, 2019, counsel for McGrath and AH DB contacted Scottsdale and tendered the

Trustee's demand. *Id*. ¶ 16.  On July 15, 2019, Scottsdale advised McGrath of its position that

McGrath was not insured by the Watershed Policy and otherwise reserved its rights. *Id*. ¶ 17.

This lawsuit followed.

## PROCEDURAL HISTORY

This action was commenced by complaint filed by Scottsdale on August 9, 2019 against

McGrath, Castlegrace, and AH DB.  Dkt. No. 1.  Scottsdale sought declaratory judgments that

McGrath is not an Insured under the Watershed Policy (Count I), that the Trustee's demand

against McGrath does not allege Wrongful Acts under the Watershed Policy and that accordingly

there is no coverage for a Claim under the Watershed Policy (Count II), that there is no coverage

for a Claim under the Watershed Policy because a subsidiary exclusion under the Watershed

Policy applies (Count III), and that untimely notice of a Claim was provided (Count IV).  On

October 22, 2019, McGrath, AH DB, and Castlegrace filed an answer, and McGrath filed

counterclaims and a third-party complaint.  Dkt. No. 14.

In his counterclaims, McGrath seeks a declaratory judgment that he is an Insured under

the Watershed Policy (Counterclaim I), damages on a theory of bad faith breach of insurance

contract (Counterclaim II), and breach of a duty to defend (Counterclaim III).  McGrath also

brings third party claims against Watershed for aiding and abetting breach of the duty to defend

(Counterclaim/Third Party Count IV), fraudulent concealment (Counterclaim/Third Party Count

V), and failure to disclose material information (Counterclaim/Third Party Count VI).  He brings

a claim for equitable lien against all counterclaim-defendants.  (Counterclaim/Third Party Count

VII).  On October 22, 2019, McGrath brought a motion for a temporary restraining order.  Dkt

No. 15.  That motion was denied by Judge Analisa Torres, to whom the case was then assigned, on October 23, 2019.  Dkt. No. 18.

On February 3, 2020, the case was reassigned to the undersigned.  On June 22, 2020, Scottsdale filed its motion for summary judgment.  Dkt. No. 36.  McGrath, AH DB, and Castlegrace filed a memorandum in opposition on July 20, 2020.  Dkt. No. 44.  On August 3, 2020, Scottsdale filed its reply brief.  Dkt. No. 48.

Scottsdale seeks summary judgment on Counts I-III of the Complaint.  The parties do not dispute any of the material facts at issue.  *See* Dkt. No. 46.  Rather, the motion presents a pure question of law whether, during the relevant time period, Rocky Aspen fell under the definition of Subsidiary in the Watershed Policy.  Scottsdale argues that Rocky Aspen only became a Subsidiary, so-defined, after it exercised the Watershed Option and McGrath was removed.  *See* Dkt. No. 37 at 9 ("The question present is straightforward – was Rocky Aspen a Subsidiary of Watershed during the time McGrath served as co-manager?  The answer is no, and the Court should enter summary judgment for Scottsdale.").  But Scottsdale's only theory is that because the only alleged wrongdoing against McGrath concerns events that pre-date exercise of the Watershed Option, and because, according to Scottsdale, Rocky Aspen was not a Subsidiary of Watershed *until* after exercise of the Watershed Option, McGrath was not an Insured under the Watershed Policy in the relevant time period.  *See id*.  Scottsdale does not argue—and there are not facts in the summary judgment record to support—that if Rocky Aspen *were* a Subsidiary of Watershed as defined in the Watershed Policy before the exercise of the Watershed Option, McGrath was not covered by the policy as a co-manager of Rocky Aspen.  *See id.* at 8-11.  As elaborated below, because Scottsdale's interpretation of the definition of Subsidiary in the

9

Watershed Policy is incorrect, and because Rocky Aspen was a Subsidiary so-defined upon the occurrence of the Watershed Option Triggering Events, Scottsdale's motion is denied.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id*. at 114 (quoting *Celotex*, 477 U.S. at 323). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

An insurance policy is interpreted under ordinary common law contract principles, giving effect to the intent of the parties as expressed in the clear language of the contract. *MBIA Inc. v. Fed. Ins Co.*, 652 F.3d 152, 158 (2d Cir. 2011). Thus, "[a]s with the construction of contracts generally, 'unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.'" *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 855 N.Y.S.2d 45, 48 (N.Y. 2008) (quoting *White v. Continental Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)). "[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 69 N.Y.S.3d 520, 524 (N.Y. 2017) (quotation marks omitted). "Courts may not, through their

interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Id.* at 525. "In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Id.* (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 648 N.Y.S.2d 422 (N.Y. 1996)).

## DISCUSSION

The principal issue in dispute between the parties is whether McGrath is an Insured under the Watershed Policy based on his position as a co-manager of Rocky Aspen. The critical, purely legal question is when Rocky Aspen became a Subsidiary of Watershed as defined in the Watershed Policy. The relevant language appears in Section B.11 of the General Terms and Conditions which defines a Subsidiary to mean:

a. Any entity of which more than fifty percent of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly, if such entity

    i.    was so owned on or prior to the inception date of this Policy; or

    ii.    ii.  becomes so owned after the inception date of this Policy; and

b. any joint venture entity in which the Parent Company, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the Parent Company or entity described in a. above solely controls the management and operations of such joint venture entity.

Watershed Policy, General Terms and Conditions § B(11)(a) and (b) (hereinafter "Subsection (a)" and "Subsection (b)").

Scottsdale argues that Rocky Aspen only became a Subsidiary when RAM 204 exercised the Watershed Option on January 5, 2016. Until exercise of the Watershed Option, Scottsdale argues, Rocky Aspen was solely a joint venture between RAM 204 and AH DB, and one in

which each member possessed an exact 50% ownership interest, and as such was governed by Subsection (b).  Because prior to January 5, 2016 McGrath remained a co-manager of Rocky Aspen, the argument continues, RAM 204—and, by extension, Watershed—did not "solely control[] the management and operations" of the Rocky Aspen Joint Venture until that date.  *See* Subsection (b).  Because all of the alleged Wrongful Acts upon which McGrath bases his claim for coverage commenced prior to January 5, 2016, Scottsdale's argument concludes, McGrath was not an Insured under the Watershed Policy during the relevant time period.

McGrath takes a different view.  He agrees that he is covered only if Rocky Aspen is properly understood as a Subsidiary under the Watershed Policy and only for Wrongful Acts allegedly committed by him in his capacity as a co-manager thereof.  He argues, however, that after the Watershed Option was triggered on March 25, 2015, Watershed was a Subsidiary pursuant to both Subsections (a) and (b).  As to Subsection (a), McGrath argues that Watershed owned 100 percent of the Voting Units in Rocky Aspen after the Watershed Option was triggered, meaning that Rocky Aspen satisfied the definition "[a]ny entity of which more than fifty percent of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly . . ." Subsection (a).  As to subsection (b), McGrath contends that because after the Watershed Option Triggering Events RAM 204 was authorized to remove McGrath as a co-manager at any time— including in the event of any deadlock between the co-managers, *see* Operating Agreement § 3.7—and because RAM 204 and AH DB each owned fifty percent of the Economic Units until January 5, 2016, Rocky Aspen also satisfied Subsection (b).  According to this argument, after March 25, 2015, Watershed owned fifty percent of the Economic Units of Rocky Aspen and also "solely control[ed] [Rocky Aspen's] management and operations."  Subsection (b).

McGrath is correct that after the Watershed Option was triggered—both before and after it was exercised—Rocky Aspen satisfied Subsection (a).  The language of Subsection (a) is broad.  It applies to "any entity."  Under New York Law, "the word 'any' means 'all' or 'every' and imports no limitation."  *Kimmel v. State*, 29 N.Y.3d 386, 392 (2017) (citation omitted).  It is not limited to public corporations but applies as well to joint ventures and limited liabilities companies such as Rocky Aspen.  The only qualifications to Subsection (a) are that an entity have either "directors" (the stewards of public corporations) or "managers" (the stewards of limited liability companies) and that those directors or managers are elected by a parent company holding a majority of outstanding securities representing a present right to vote.  Rocky Aspen— and Watershed, as its parent—satisfied those criteria.

Though formed as a result of a joint venture contract, Rocky Aspen had "managers" who were elected by the members who had Voting Units in Rocky Aspen.  Pursuant to the Operating Agreement, "[u]pon occurrence of any Watershed Option Triggering Event, the Aristone Member [AH DB] shall forfeit all of its Voting Units without any consideration being paid or provided therefore."  Operating Agreement § 4.2.  There is no dispute that the Watershed Option was triggered on March 25, 2015, *see supra*; pursuant to Section 4.2 of the Operating Agreement, upon such occurrence AH DB forfeited its Voting Units and RAM 204 obtained the sole power to remove and appoint directors of Rocky Aspen.  Indeed, Scottsdale conceded as much at oral argument.  *See* Tr. at 13:4-13 (Nov. 23, 2020).  Thus, after the Watershed Option was triggered, Watershed, indirectly and through RAM 204, owned "more than fifty percent of the outstanding securities representing the present right to vote for the election of [Rocky

Aspen's] . . . managers."  Subsection (a).[2]  At that time, Watershed, through RAM 204, alone

had "the sole right to appoint, remove and replace Co-Managers."  Operating Agreement § 3.6.

Scottsdale has two responses, neither of which is convincing.  First, it argues that

Watershed did not own more than fifty percent of the outstanding securities of Rocky Aspen

because the units in Rocky Aspen—whether Economic Units or Voting Units—did not satisfy

the Supreme Court test for "security" set out in *Securities & Exch. Comm'n. v. Howey Co.*, 328

U.S. 293, 297–98 (1946) and its progeny.  The so-called "*Howey* test" is whether "looking at the

economic realities, the transaction involved an investment of money in a common enterprise with

profits to come solely from the efforts of others."  *All Seasons Resorts, Inc. v. Abrams*, 68

N.Y.2d 81, 92 (1986) (quoting *Lamber Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985))

(internal quotation marks omitted).  This definition, however, applies specifically to "investment

---

[2] At first blush there might appear to be tension between Sections 4.2 and 2.7 of the Operating
Agreement, which tension could be construed to favor Scottdale's position.  As noted above,
Section 4.2 provides that "[u]pon occurrence of any Watershed Option Triggering Event, the
Aristone Member [AH DB] shall forfeit all of its Voting Units without any consideration being
paid or provided therefore."  Operating Agreement, Voting Rights of Members § 4.2.  Section
2.7 provides that "[t]he Watershed Member is hereby granted an *option* to purchase up to that
number of Economic Units and Voting Units set forth opposite its name on Schedule 5.1 . . .
immediately following the occurrence of [a Watershed Option Triggering Event]."  *Id*., General
Matters § 2.7 (emphasis added).  Without Section 4.2, Section 2.7 could be read to mean that
until Watershed exercised the Watershed Option, the Voting Units that were allocated to AH DB
pursuant to Schedule 5.1 would remain in AH DB's possession.  Even considering that Section
4.2 explicates that AH DB forfeits its Voting Units upon occurrence of any Watershed Option
Triggering Event, Scottsdale might argue that until Watershed exercised the option, it did not
"own" "more than fifty percent of the outstanding securities representing the present right to
vote" in Rocky Aspen, because it did not yet own the Voting Units forfeited by AH DB.
Watershed Policy, General Terms and Conditions § B(11).  This theory is belied by the terms
"present right to vote" and "outstanding securities" in Watershed's definition of Subsidiary.
Once AH DB forfeited its Voting Units, the only present right to vote was vested in RAM 204.
Moreover, although prior to exercising the Watershed Option Watershed did not own the Voting
Units that AH DB forfeited, those units were no longer "outstanding" after AH DB forfeited
them.  *See* Black's Law Dictionary (11th ed. 2019) (defining "security" as "outstanding" and
"outstanding security" as "[a] security that is *held by an investor* and has not been redeemed by
the issuing corporation") (emphasis added).

contracts."  *See Howey*, 328 U.S. at 297 ("Section 2(1) of the [Securities Act of 1933] defines the term 'security' to include the commonly known documents traded for speculation or investment. This definition also 'securities' of a more variable character, designated by such descriptive terms as . . . 'investment contract.'"); *id*. at 298–99 ("[A]n *investment contract* for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . ."); *see also Landreth*, 471 U.S. at 689 (reciting the *Howey* test as defining "investment contract").

As noted in *Howey* itself, *see* 328 U.S. at 297, the definition of "security" provided in the Securities Exchange Act is much broader, encompassing investment contracts but also other investment vehicles.  Under 15 U.S.C. § 78c(a)(10), the term "security" is defined to mean:

> [A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

*See also Howey*, 328 U.S. at 297 n.3 (quoting the definition of "security" in the Securities Exchange Act).

As this definition makes clear, the term security does not preclude a voting interest that is divorced from economic interest, such as is the case with the Voting Units in Rocky Aspen.  *See,*

15

*e.g.*, *Abercrombie v. Davies*, 130 A.2d 338, 344 (1957) ("A review of the Delaware decisions upon the subject of voting trusts shows that our courts have indicated that one essential feature that characterizes a voting trust is the separation of the voting rights of the stock from the other attributes of ownership."); 15 U.S.C. § 78c(a)(10) (including "voting trust certificate" in the definition of "security").  The Voting Units of Rocky Aspen also fit comfortably within dictionary definitions of "security."  *See, e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/security (last visited December 8, 2020) (defining "security" as "3. an instrument of investment in the form of a document (such as a stock certificate or bond) providing evidence of its ownership").  Thus, the Voting Units in Rocky Aspen should be understood as securities pursuant to Subsection (a).

Scottsdale's interpretation of Subsection (a), moreover, proves too much and, if accepted, would make a hash of the contractual language.  There are many corporate vehicles that Scottsdale recognized would qualify as subsidiaries under Subsection (a) but that do not have securities that fit its definition.  For example, a corporation can form a limited liability company to conduct business and may own and control more than 50% of it.  The securities owned by a parent to such an LLC would be no different from what Watershed held in Rocky Aspen after the Watershed Option Triggering Events.  Scottsdale conceded at argument that such entity would be covered by Subsection (a), even though such an entity would not satisfy the *Howey* test.  *See* Tr. at 9:12-17 (Nov. 23, 2020).  In addition, a corporation could incorporate a public company that it wholly owns and controls.  No one could contend in that circumstances that such a company would not be a "Subsidiary" of the corporation that founded it as defined by Watershed Policy, notwithstanding that the parent corporation's interest in such a company would fail the *Howey* test.  But that is the result that Scottsdale's interpretation of "security," as it appears in the

Watershed Policy's definition of "Subsidiary," would require. That plainly was not the intent of the drafters when they drafted Subsection (a) to cover "any entity," as opposed to covering only publicly held corporations whose shares are held by passive investors.

Second, Scottsdale suggested in its papers and at argument that because Rocky Aspen is a "joint venture entity," in the sense that it was formed as a result of a joint venture agreement between RAM 204 and AH DB, it cannot also be "any entity" under Subsection (a) and that because it fails to satisfy the criteria under Subsection (b), it does not satisfy the definition of Subsidiary in the Watershed Policy. This argument is contradicted by the plain language of the definition: as noted above, the term "any entity" is broader than—and comfortably encompasses—the term "any joint venture entity." *See Kimmel*, 29 N.Y.3d at 392. Both Subsection (a) and Subsection (b) use the term "entity." Reading the two paragraphs together, it is evident that the "entity" referred to in Subsection (a) includes an entity formed as a result of a joint venture or a "joint venture entity", and that the addition in Subparagraph (b) of the words "joint venture" to qualify the word "entity" was intended to identify a subset of Subparagraph (a) entities that might also be covered by Subparagraph (a) and was not intended to limit the types of entities covered under Subparagraph (a).

Scottsdale's interpretation would also lead to a perverse consequence that could never have been intended by the parties. Under its interpretation, an entity formed as a joint venture could only be a subsidiary if both (a) it has an exact 50% ownership interest and (b) it solely controls management and operations of the joint venture. This interpretation would preclude identifying as Subsidiaries joint venture entities in which one member solely controls management and operations only on the grounds that it owns *more* than a fifty percent interest in the venture. Such an entity, according to Scottsdale's argument, is not a Subsidiary under

Subsection (a) because it is formed as a result of a joint venture agreement,[3] and is not a Subsidiary by the plain terms of Subsection (b) because no party has "an exact fifty percent (50%) ownership of the interests of such joint venture entity."  Subsection (b).

The more logical interpretation of Subsection (b) is that, whereas Subsection (a) applies to any entity that is majority-owned by a parent, Subsection (b) applies to any joint venture entity that is owned by two members equally, but as to which the parties have contractually allocated control of management and operations to only one member.  That member does not own more than fifty percent of the voting interests, so the entity is not its Subsidiary pursuant to Subsection (a), but it does own fifty percent of the interests and enjoys sole control, so the entity is its Subsidiary pursuant to Subsection (b).  Unlike Scottsdale's interpretation, this reading of the Watershed Policy does not preclude identifying as a Subsidiary any entity formed as the result of a joint venture agreement but as to which one member owns more than fifty percent of the interests.  Under the correct interpretation, such an entity would be a Subsidiary of the majority owner pursuant to Subsection (a), as the interests such an entity would presumptively carry the power to vote on the entities' managers and directors.

Defendants' alternative argument is that Rocky Aspen satisfied Subsection (b).  Until Watershed exercised the Watershed Option, both parties still owned 50 percent of the Economic Units of Rocky Aspen.  It follows, Defendants argue, that in addition to being an entity whose voting interests were wholly controlled by Watershed, in satisfaction with Subsection (a), Rocky Aspen was also a joint venture as that phrase is used in Subsection (b).  Defendants' argument continues that, under the language of the Operating Agreement, Watershed had sole control of

---

[3] The Court need not and does not analyze they necessary elements that constitute a "joint venture" under Subsection (b).

the management and operations of Rocky Aspen, thus satisfying the definition of Subsidiary under Subsection (b).  Defendants arrive at that conclusion from two places in the contractual language.  First, Defendants point to the language that provides that after the Watershed Option Triggering Events, Watershed alone had the right to remove McGrath as a manager and for any reason.  *See* Operating Agreement § 3.6 ("If the Watershed Option becomes exercisable . . . the Watershed Member shall have the sole right to appoint, remove and replace Co-Managers.").  Defendants thus argue that because McGrath was serving at Watershed's will after March 25, 2015, Watershed had effective sole control and management of the joint venture entity.  Second, Defendants point to Section 3.7 of the Operating Agreement, which provides that in the event that "the Co-Managers are unable to agree jointly on a course of action with respect to one or more matters or issues of importance to the Company, and which such inability to agree may materially and adversely affect the ability of the Company to operate effectively" and the matter cannot be resolved between the co-managers, then one or more of Rocky Aspen's members may attempt to replace a co-manager.  *Id.* § 3.7.  Defendants argue that because, after the Watershed Triggering Event, only Watershed could exercise the right to remove a co-manager, Watershed had effective control of Rocky Aspen.

Defendants' argument, however, does justice neither to the language of the Watershed Policy nor the language of the Operating Agreement.  The language of the Watershed Policy includes under Subsection (b) only those entities where, pursuant to the joint venture agreement, the parent company or another subsidiary solely controls the management and operations of the joint venture entity.  It does not refer to effective control, or voting interests.  Voting interests are covered by Subsection (a).  That control over management and operations is distinct from possession of voting interests is reflected in the Operating Agreement.  *Id.* § 4.1 ("No Member

may (i) take part in, or interference in any manner with, the management, conduct or control of the business or affairs of the Company other than, in the case of a Member, granting or withholding that Member's Approval with respect to any action to be taken by the Members hereunder or (ii) take any action to bind or otherwise act for or on behalf of the Company."). Pursuant to the Operating Agreement, until McGrath was removed, he was a manager and able to participate in and affect decisions pertaining to Rocky Aspen management.  To be sure, he could be removed.  But there could be any number of reasons why Watershed might disagree with one or another of his decisions and still prefer—on balance—that he be maintained as a manager. Until he was removed by Watershed, McGrath, in his capacity as AH DB's selected co-manager, partially controlled Rocky Aspen.  Therefore Watershed, via RAM 204, also partially—not solely—controlled Rocky Aspen.

Section 3.7 of the Operating Agreement does not change that analysis.  Pursuant to Section 3.7, in the event of a disagreement between the co-managers of Rocky Aspen that "may materially and adversely affect the ability of [Rocky Aspen] to operate effectively," the members may "attempt to replace the Co-Managers pursuant to the terms of [the Operating Agreement]." *Id.* § 3.7 This provision fails to establish Watershed's sole control for two reasons.  First, as described above, the power to appoint and remove directors does not alone imply sole control over management and operations.  Second, Section 3.7 contemplates that there may be disagreements among the managers that would *not* materially and adversely affect the ability of Rocky Aspen to operate effectively, but which nevertheless may meaningfully affect its operations and management.  Such disagreements, under the plain language of the Operating Agreement, would not be referred to the tiebreaker provisions and thus would not themselves trigger Watershed's right to replace McGrath.

**CONCLUSION**

For the foregoing reasons, Scottsdale's motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to close the motion at Dkt. No. 36. Pursuant to the Case Management Plan, all discovery is scheduled to be completed no later than December 31, 2020. *See* Dkt. No. 42. The Court will hold a post-discovery status conference by TELEPHONE CONFERNECE on January 6, 2021 at 4:00 p.m. At that date and time the parties are directed to dial the Court's teleconference line at 888-251-2909 (access code: 2123101).


    SO ORDERED.

Dated: December 11, 2020                          _____
        New York, New York                            LEWIS J. LIMAN
                                                   United States District Judge