UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/19/2021__
```

-----------------------------------------------------------------------X
                             :

SCOTTSDALE INSURANCE COMPANY,    :

            Plaintiff,    :

                             :        19-cv-07477 (LJL)

    -v-    :

                             :      <u>OPINION AND ORDER</u>

PATRICK MCGRATH, AH DB KITHCEN    :
INVESTORS LLC, and CASTLEGRACE EQUITY    :
INVESTORS, LLC,    :

                             :

            Defendants.    :
-----------------------------------------------------------------------X
PATRICK MCGRATH,    :

                             :

            Third-Party Plaintiff,    :

                             :

    -v-    :

                             :

CRAVEABLE HOSPITALITY GROUP f/k/a    :
WATERSHED VENTURES, LLC,    :

                             :

            Third-Party Defendant.    :
----------------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

        Plaintiff Scottsdale Insurance Company ("Scottsdale") moves, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment to dismiss the second counterclaim by Defendant Patrick McGrath ("McGrath") asserting a claim of bad faith liability for Scottsdale's denial of coverage and and refusal to settle.  *See* Dkt. No. 63 at 5.  Scottsdale also seeks dismissal of the prayer in the counterclaims for consequential and punitive damages exceeding the applicable policy limits.  *Id.*

        For the following reasons, the motion is granted.

# BACKGROUND

The following facts, which are drawn from the parties' Rule 56.1 statements on this motion and on the prior motion for summary judgment, are undisputed, unless otherwise indicated.  Familiarity with this Court's prior opinion and order, *Scottsdale Ins. Co. v. McGrath*, 506 F. Supp. 3d 216 (S.D.N.Y. 2020), is assumed.

Scottsdale is the insurer on Business and Management Indemnity Policy number EKS3172343, Dkt. No. 1-1 (the "Watershed Policy"), issued to an entity called Watershed Ventures, LLC ("Watershed").  The Watershed Policy affords, subject to its terms, conditions, and exclusions, Directors and Officers and Company Coverage ("D&O Coverage").  The Watershed Policy extends D&O coverage to Watershed and, as relevant here, any Subsidiary of Watershed, defined as "[a]ny entity of which more than fifty percent of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly, if such entity (i) was so owned on or prior to the inception date of this Policy; or (ii) becomes so owned after the inception date of this Policy."  *Id.*, General Terms and Conditions § B(11).  It also defines as an Insured the "Directors and Officers," which it defines to include "a duly elected or appointed director, officer, or similar executive of [Watershed or a Subsidiary] or any member of the management board of [Watershed or a Subsidiary]."  *Id.*, D&O Coverage § B(4).

Watershed is the parent corporation of a limited liability corporation named Rocky Aspen Management 2014, LLC ("RAM 204").  RAM 204 is a member of a limited liability corporation, Rocky Aspen, LLC ("Rocky Aspen").  Rocky Aspen was formed as a joint venture with AH DB Kitchen Investors LLC ("AH DB"), a Delaware limited liability company.  AH DB's sole member is Aristone Hospitality LLC ("Aristone").  In turn, McGrath, is the sole member of Aristone.

Rocky Aspen was formed on or about April 24, 2013 to open and operate a "full service, first class, upscale, cocktail lounge" and "full service, high quality, fine dining, restaurant, maintaining standards consistent with other restaurants of Watershed Ventures LLC" in Aspen, Colorado.  Dkt. No. 47-1 § 2.2.  McGrath was appointed by AH DB to be its designated co-manager of Rocky Aspen, removable (as a general matter) only by the appointing member and "responsible for the day-to-day operational decision making of [Rocky Aspen]."  Dkt. No. 38-1 § 3.2(a).  RAM 204 appointed McGrath's co-manager.  Pursuant to the Rocky Aspen's operating agreement, AH DB and RAM 204 each owned half of the company in the form of fifty percent of the voting units and fifty percent of the economic units.  *See Scottsdale Ins. Co.*, 506 F. Supp. 3d at 219.  Also pursuant to the operating agreement, AH DB was to make financial capital contributions to Rocky Aspen, while RAM 204 contributed in kind a license to use the Watershed brand and conceptual design.  *Id*.

The operating agreement contained a provision pursuant to which, if AH DB failed to meet its funding obligations by the applicable deadline of March 25, 2015, AH DB would "immediately forfeit 100% of its Voting Units without being paid any consideration therefor," Dkt. No. 38-1 § 5.2, and RAM 204 would acquire an option (the "Watershed Option") to purchase 9,000 additional economic units and 9,000 additional voting units, *id*. § 2.7.

AH DB failed to meet its funding obligations by the applicable deadline of March 25, 2015.  In May 2015, in order to fund certain opening costs for Rocky Aspen, McGrath secured a $3.2 million loan from Hanford Holdings, Inc. ("Hanford").  Dkt. No. 69 ¶ 27.  On January 5, 2016, RAM 204 exercised the "Watershed Option" and removed McGrath as co-manager of Rocky Aspen.  *Scottsdale Ins. Co.*, 506 F. Supp. 3d at 220.

On or about March 11, 2016, Rocky Aspen—then solely managed by RAM 204—filed for Chapter 7 bankruptcy.  Dkt. No. 46 ¶ 11.

The Bankruptcy Proceedings led to claims being asserted against McGrath personally. On April 16, 2016, Watershed filed a claim against McGrath in the Rocky Aspen Bankruptcy Proceeding ("Bankruptcy Claim").  Dkt. No. 69 ¶ 37.  On June 8, 2016, RAM 204 filed claims against Hanford arising out of the default ("Hanford Litigation").  Dkt. No. 68 ¶ 14.  Hanford answered and asserted counterclaims and third-party claims against, inter alia, Watershed, Aristone, AH DB, Castlegrace, and McGrath.  *Id.* ¶ 15; Dkt. No. 69 ¶ 41.  On July 8, 2016, Hanford demanded payment from McGrath of a guaranty issued in connection with the loan. Dkt. No. 69 ¶ 40.

On November 9, 2016, Watershed provided Scottsdale a notice of a claim under the Policy in connection with the Hanford Litigation.  *Id.* ¶ 44; Dkt. No. 69-11.  Scottsdale responded two months later, on January 5, 2017, that RAM 204, McGrath, AH DB, Castlegrace, and Aristone were not Insureds under the Policy.  Dkt. No. 69 ¶ 46; Dkt. No. 69-12.  Scottsdale did not send McGrath a copy of the Watershed policy.  Dkt. No. 69 ¶ 48.

On June 7, 2019, Rocky Aspen's Trustee in Bankruptcy asserted an avoidance claim against McGrath ("Trustee Litigation").  *Id.* ¶ 50.  The Trustee offered to settle the claim for $1.4 million.  *Id.*  His demands and claims related to the Bankruptcy Claim filed on April 16, 2016, and the Hanford claims filed on July 27, 2016.  *Id.*  On June 7, 2019, the same day it was received, McGrath tendered the Trustee's demand to Scottsdale.  *See* Dkt. No. 69-14 at 6.  On June 10, 2019 a representative of Scottsdale emailed counsel for McGrath stating "I am in receipt of your tender below.  Please advise how you believe Patrick McGrath or AHDB Kitchen are insureds under the Watershed Policy.  Please provide documentation supporting your position.

Scottsdale reserves all rights for this matter under the Policy, in equity and at law." *Id*. at 5-6. Counsel for Mcgrath responded on June 13, 2019 arguing that McGrath was an Insured because Rocky Aspen was a "Subsidiary" of Watershed as defined in the Watershed Policy and that McGrath was insured as a director of Rocky Aspen. *Id*. at 4; Dkt. No. 69-15.  On the evening of July 12, 2019 at 7:09 PM, counsel for McGrath emailed a representative of Scottsdale that the "deadline for a response to the Trustee's settlement demand was today" and stating that since McGrath's June 13, 2019 communication arguing that McGrath was an Insured under the policy, "we have not heard back from you."  Dkt. No. 69-14 at 4-5.  The email concluded "On Monday [July 15, 2019] I will need to contact the Trustee and I would like clarity on your position before I do—one way or the other." *Id*.  On July 15, 2019 at 9:34 p.m. a representative of Scottsdale responded "Scottsdale maintains that there is no coverage for the trustee's demand for a host of reasons.  Our full response and explanation should be coming to you in a letter today." *Id*. at 4; *see* Dkt. No. 14-9.[1]

On August 9, 2019, Scottsdale commenced this action seeking, among other things, declaratory judgments that McGrath was not an Insured under the Watershed Policy (Count I), that the Trustee's demand against McGrath did not allege Wrongful Acts under the Watershed Policy and that accordingly there was no coverage for a Claim under the Watershed Policy (Count II), that there was no coverage for a Claim under the Watershed Policy because a subsidiary exclusion under the Watershed Policy applied (Count III), and that untimely notice of a Claim was provided (Count IV).  The previous summary judgment motion before this Court

---

[1] Representatives for Scottsdale and McGrath exchanged further emails in August 2019 reflecting continued disagreement regarding the status of McGrath as an insured under the Watershed Policy; counsel for McGrath represented that they would be filing suit challenging Scottsdale's refusal of coverage. *Id*. at 1-4.

addressed the question whether McGrath was a Director and Officer under the Watershed Policy and therefore entitled to coverage as an Insured by virtue of his position as a Member of Rocky Aspen before he was removed on January 5, 2016.

In the prior summary judgment opinion, the Court concluded that Rocky Aspen was a Subsidiary under the Watershed Policy and that McGrath was a Director and Officer, and therefore an Insured, after AH DB defaulted and the Watershed Option became available.  *See Scottsdale Ins. Co.*, 506 F. Supp. 3d at 223-24.  In so doing, it rejected Scottsdale's argument that a different provision of the Watershed Policy that defined a Subsidiary to include a "joint venture" whose operating agreement gave Watershed sole control of management—and pursuant to which McGrath would not be an Insured—should control over and above the definition that made Rocky Aspen a Subsidiary because Watershed owned more than fifty percent of its outstanding securities representing the right to vote.  It also rejected Scottsdale's argument that Rocky Aspen only became a subsidiary of Watershed when RAM 204 exercised the Watershed Option on January 5, 2016—at which time it simultaneously removed McGrath as a director.  *Id.* at 223.  It concluded that Watershed became the owner of a majority of the voting shares not upon the exercise of the Watershed Option but on the date that the Watershed Option was triggered.  *See id.* at 223-228.  The Court did not decide whether the underlying claims against McGrath were covered by the Policy, or whether—if they are covered—McGrath could recover amounts exceeding the Policy limit.

That opinion left McGrath with at least a breach of contract claim with damages within the policy limits.  McGrath, however, seeks more:  he brings a claim for bad faith liability and for consequential and punitive damages.

Scottsdale moves for partial summary judgment to dismiss McGrath's second counterclaim for bad faith liability and the prayer in the counterclaims for consequential and punitive damages exceeding the applicable policy limits. *See* Dkt. No. 63 at 5.

## PROCEDURAL HISTORY

This action was commenced by complaint filed by Scottsdale on August 9, 2019 against McGrath, Castlegrace, and AH DB. Dkt. No. 1. Scottsdale sought declaratory judgments that McGrath was not an Insured under the Watershed Policy (Count I), that the Trustee's demand against McGrath did not allege Wrongful Acts under the Watershed Policy and that accordingly there was no coverage for a Claim under the Watershed Policy (Count II), that there was no coverage for a Claim under the Watershed Policy because a subsidiary exclusion under the Watershed Policy applies (Count III), and that untimely notice of a Claim was provided (Count IV). On October 22, 2019, McGrath, AH DB, and Castlegrace filed an answer, and McGrath filed counterclaims and a third-party complaint. Dkt. No. 14.

In his counterclaims, McGrath sought a declaratory judgment that he was an Insured under the Watershed Policy (Counterclaim I), and damages on a theory of bad faith breach of insurance contract (Counterclaim II) and breach of a duty to defend (Counterclaim III). McGrath also brought third party claims against Watershed for aiding and abetting breach of the duty to defend (Counterclaim/Third Party Count IV), fraudulent concealment (Counterclaim/Third Party Count V), and failure to disclose material information (Counterclaim/Third Party Count VI). He brought a claim for equitable lien against all counterclaim-defendants. (Counterclaim/Third Party Count VII).

On October 22, 2019, McGrath brought a motion for a temporary restraining order. Dkt. No. 15. That motion was denied by Judge Analisa Torres, to whom the case was then assigned, on October 23, 2019. Dkt. No. 18.

On February 3, 2020, the case was reassigned to the undersigned.  On June 22, 2020, Scottsdale filed a motion for summary judgment.  Dkt. No. 36.  McGrath, AH DB, and Castlegrace filed a memorandum in opposition on July 20, 2020.  Dkt. No. 44.  On August 3, 2020, Scottsdale filed its reply brief.  Dkt. No. 48.

On December 11, 2020, this Court denied Scottsdale's motion for summary judgment. *See Scottsdale Ins. Co.*, 506 F. Supp. 3d at 228.

On April 15, 2021, Scottsdale filed a motion for partial summary judgment on the issues before this Court today.  *See* Dkt. No. 63.  McGrath submitted an opposition memorandum on April 29, 2021.  Dkt. No. 67.  Both parties submitted statements of undisputed facts with their memoranda as required by Local Civil Rule 56.1.  *See* Dkt. No. 64; Dkt. No. 68; Local Civil Rule 56.  Finally, Scottsdale filed a reply memorandum in support of its motion on May 6, 2021. Dkt. No. 70.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'"  *Id.* at 114 (quoting *Celotex*, 477 U.S. at 323).  In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

**DISCUSSION**

The Court considers first the bad faith liability claim and then the prayer in the counterclaims for consequential and punitive damages.

McGrath alleges that Scottsdale was obligated to provide him with a defense and indemnification in the claims against him and that it breached that obligation in bad faith.  *See* Dkt. No. 14 ¶¶ 139-40.  He argues that after Watershed provided a notice of claim to Scottsdale on November 9, 2016 when it noticed Scottsdale of the Hanford Litigation which involved McGrath and Rocky Aspen,  *Id.* ¶ 141; *See* Dkt. No. 69-11 at 2; Dkt. No. 69 ¶ 44, Scottsdale "would or should have discovered that McGrath was a Director and Officer of Rocky Aspen, a Subsidiary of Watershed, and therefore an Insured under the Policy."  Dkt. No. 14 ¶¶ 142-43.  McGrath argues that even though Scottsdale "investigated whether or not McGrath was an Insured as under the Policy," *see* Dkt. No. 69 ¶¶ 46-47 (citing Dkt. No. 69-12), it failed to provide him with its denial and was silent regarding the existence of the Policy during the pendency of the claims against him.  *Id.* ¶ 47.  He alleges he only became aware of the Policy in November 2018.  *Id.* ¶¶ 48-49.  McGrath further alleges that Scottsdale did not respond to his June 2019 tender of the Trustee's offer to settle the avoidance claim against him until after that offer had expired and then wrongfully denied coverage, thereby depriving McGrath of an opportunity to settle.  *Id.* ¶¶ 50-52, 61-64.

McGrath argues Scottsdale breached its duty to investigate the basis of his claims.  Dkt. No. 14 ¶ 144.  He also alleges that by refusing to acknowledge the validity of McGrath's claims, Scottsdale "knowingly or recklessly disregarded facts supporting McGrath's status as an insured."  *Id.* ¶ 145.  He claims that he was damaged in an amount over $1.5 million for the Trustee's claims and other losses.  *Id.* ¶ 146.  Lastly, he claims entitlement to punitive damages "insofar as Watershed and Scottsdale willfully, knowingly and fraudulently colluded to hide the

existence of the Policy from McGrath, in order to ensure that McGrath would not receive coverage" for claims against him.  *Id.* ¶ 147.  On these facts, McGrath alleges that Scottsdale acted in actionable bad faith.  *See* Dkt. No. 67 at 21-26.  McGrath argues that as a consequence of Scottsdale's bad faith, he has been "forced to expend hundreds of thousands of dollars in his own defense . . . and is also now faced with the serious potential of two judgments . . . more than $8 million of which is interest, which could have been completely avoided by a reasonable early case analysis and payment of the amounts Hanford claimed in settlement years ago."  Dkt. No. 67 at 10.

McGrath's second claim for "Bad Faith Breach of Insurance Contract" can be understood to allege (1) a breach of duty, independent of any breach of contract claim, of bad faith denial of coverage or bad faith failure to settle, for which extracontractual damages are available or (2) a mere breach of contract claim for which consequential and punitive damages are appropriate because of Scottsdale's alleged bad faith.  Section A of this opinion analyzes whether McGrath has alleged an independent claim of bad faith liability for which extracontractual damages are available.  Section B analyzes whether McGrath can sustain a claim for consequential or punitive damages for breach of contract, either under his second claim or under the counterclaims when read in their entirety.   Both theories are rejected.

> **A.**      **There is no triable issue that Scottdale is liable for an independent claim of bad faith liability for its denial of coverage or refusal to settle.**

To the extent that the Second Claim purports to allege an independent claim for bad faith liability, McGrath has not identified facts sufficient to sustain such a claim either with respect to the denial of coverage and a defense or with respect to his allegation that Scottsdale wrongfully frustrated his ability to settle.

There is authority under New York law for a claim of bad faith liability in a third-party insurance context both in the denial of coverage and for bad faith failure to settle. *See, e.g.*, *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001) (analyzing whether a third-party insurer breached its duty of good faith and fair dealing and was subject to a claim of "bad faith liability" for denying coverage but concluding that the facts did not support such a claim); *Pavia v. State Farm Mut. Auto. Ins. Co.*, 605 N.Y.S.2d 208, 210-211 (1993) (bad faith refusal to settle).[2]   At least in the context of "defending and settling claims," that duty derives from the "exclusive control [an insurer has to exercise] on behalf of its insured." *Pavia*, 605 N.Y.S.2d at 210.   "At the root of the 'bad faith' doctrine is the fact that insurers typically exercise complete control over the settlement and defense of claims against their insureds, and,

---

[2] In the first-party context, "New York Law . . . does not recognize . . . 'an independent cause of action for bad faith denial of insurance coverage.'" *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 223 (S.D.N.Y. 2010), *aff'd*, 453 F. App'x 108 (2d Cir. 2012) (quoting *Vitrano v. State Farm Ins. Co.*, 2008 WL 2696156, at *3 (S.D.N.Y. July 8, 2008); *see Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 123 (S.D.N.Y. 2002) ("Under New York law, an independent tort action for bad faith denial of insurance coverage is not recognized."); *Sikarevich Fam. L.P. v. Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d 166, 171 (E.D.N.Y. 2014) ("Like good faith and fair dealing claims, a claim for 'bad faith denial of coverage . . . would be duplicative of a claim sounding in breach of contract.") (quoting *Goldmark, Inc. v. Catlin Syndicate Ltd.*, 2011 WL 743568, at *4 (E.D.N.Y. Feb. 24, 2011)); *N.Y. Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 286-90 (1995) (discussing the unavailability of a tort remedy in the absence of a duty apart from contractual obligations and dismissing bad faith-type claim in the absence of an underlying tort duty).   In *New York University*, 639 N.Y.S.2d at 286, the New York Court of Appeals, addressing a claim for bad faith denial of commercial crime insurance, held that tort liability can only attach where a defendant has "breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *Id.* at 287.   The Court noted that "in *Sommer* [*v. Federal Signal Corp.*], we held that a fire alarm company owed its customer a duty of reasonable care independent of its contractual obligations, and that notwithstanding a contractual provision exculpating the alarm company from damages flowing from its negligence, it could be held liable in tort for its gross failure to properly perform its contractual services." *Id.* at 317; *see Sommer v. Fed. Signal Corp.*, 583 N.Y.S.2d 957, 961 (1992).   However, addressing a first-party insurance claim, the Court held that "governing the conduct of insurers and protecting the fiscal interests of insureds is simply not in the same league as the protection of the personal safety of citizens." *N.Y. Univ.*, 639 N.Y.S.2d at 288.

thus, under established agency principles may fairly be required to act in the insured's best interests." *Id*. (citing 7C Appleman, Insurance Law and Practice § 4711 [Berdal ed.]); *see also CBLPath, Inc. v. Lexington Ins. Co.*, 900 N.Y.S.2d 462, 465 (2010) (citing *Pavia*, 605 N.Y.S.2d at 210); *Windmill Distrib. Co., L.P. v. Hartford Fire Ins. Co.*, 742 F. Supp. 2d 247, 263 (D. Conn. 2010), *aff'd*, 449 F. App'x 81 (2d Cir. 2012) ("The basis for judicial imposition on liability insurers of a duty to exercise good faith or due care with respect to opportunities to settle within the policy limits is that the company has exclusive control over the decision concerning settlement within policy coverage, and company and insured often have conflicting interests as to whether settlement should be made.") (quoting *Bourget v. Gov't Emp. Ins. Co.*, 456 F.2d 282, 285 (2d Cir. 1972)).

Importantly, however, "there remains a strong presumption in New York against a finding of bad faith liability by an insurer," particularly for refusing to defend. *Hugo Boss Fashions*, 252 F.3d at 624. "The presumption against bad faith liability can be rebutted only by evidence establishing that the insurer's refusal to defend was based on 'more than an arguable difference of opinion,' and exhibited 'a gross disregard for its policy obligations.'" *Id.* at 625 (quoting *Sukup v. State*, 281 N.Y.S.2d 28, 31 (1967)). Moreover, the "duty under New York law to act in 'good faith' when deciding whether to settle" a claim arises only after the insured assumes defense of a suit, and not before. *See New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 295 F.3d 232, 236 (2d Cir. 2002) (quoting *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)); *U.S. Fid. & Guar. Co. v. Ashley Reed Trading, Inc.*, 43 F. Supp. 3d 271, 281 (S.D.N.Y. 2014), *aff'd sub nom. U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146 (2d Cir. 2016).

McGrath has not identified facts that would support a claim for bad faith liability on any of the theories he has identified.  Scottsdale has established that McGrath does not have a claim for bad faith liability.

McGrath argues first that Scottsdale bears bad faith liability for its failure to notify McGrath of its position, expressed to Watershed on January 5, 2017, that McGrath was not an insured under the Policy.  However, McGrath does not identify any "policy obligations" of Scottsdale to notify McGrath of its position, much less policy obligations which it grossly disregarded.  *See Hugo Boss Fashions*, 252 F.3d at 624.  Scottsdale's January 2017 letter responded to Watershed's notice of claim arising out of the Hanford Litigation.  Scottsdale owed Watershed a response to that notice of claim.  But there is no provision of the Watershed Policy that would have required Scottsdale to proactively both inform McGrath of a potential notice of claim and simultaneously inform him that Scottsdale did not consider him an Insured entitled to make a notice of claim.  Even if Scottsdale's judgment was mistaken, the obligation under the policy lay with the Insured to, "as a condition precedent to their rights to payment under this Coverage Section only, give Insurer written notice of any Claim as soon as practicable." Watershed Policy § E(1); *see also Webster ex rel. Webster v. Mount Vernon Fire Ins. Co.*, 368 F.3d 209, 214 (2d Cir. 2004) ("an insurer's obligation to disclaim coverage as to a particular insured does not arise until *that insured* has provided notice of the occurrence or claim") (emphasis added).  The obligation does not lie with the insurer.  If—as he asserts—McGrath did not have a copy of the Watershed Policy to inform him he had a claim to make, *see* Dkt. No. 69 ¶ 48, the fault lies with Watershed or Rocky Aspen in failing to give all of its Directors or Officers a copy of the policy or, perhaps with McGrath for failing to ask whether there was a policy that covered him as a director or officer in connection with his employment with Rocky Aspen.

McGrath next argues that Scottsdale has bad faith liability for denying McGrath coverage in 2019 after McGrath provided Scottsdale with notice of the Trustee Litigation.  *See* Dkt. No. 67 at 24-26 (citing Dkt. Nos. 69 ¶¶ 45, 48, 51; 69 ¶¶ 55, 56).  McGrath tendered notice of the claim and the Trustee's settlement demand in June 2019; Scottsdale responded that it was denying coverage in mid-July 2019.  This argument also fails.  Whether analyzed for whether there is bad faith liability, *see Hugo Boss Fashions*, 252 F.3d at 624, or on a breach of contract theory, the law in New York is clear that there is "no bad faith liability for insurer who refused to defend the insured based on a mistaken belief that the insurance policy had been canceled, where there was no "gross disregard for its policy obligation by the insurer in asserting noncoverage." *Gordon v. Nationwide Mut. Ins. Co.*, 334 N.Y.S.2d 601, 604 (1972); *see also Hugo Boss Fashions*, 252 F.3d at 624 (no liability where there was "arguable difference of opinion" over the availability of coverage); *Sukup*, 281 N.Y.S.2d at 31 (no "extra-contractual liability" based on bad faith denial of coverage where an insurance carrier disclaimed obligation to defend insured against a claim brought against that insured before the Workmen's Compensation Board, because there was no "showing of bad faith in denying coverage that no reasonable carrier would, under the circumstances, be expected to assert it"); *Jane Street Holding, LLC v. Aspen Am. Ins. Co.*, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) ("[W]here an insurer's interpretation of an insurance policy is not unreasonable no bad faith can be found.  Mere difference of opinion between an insurer and an insured over the availability of coverage does not constitute bad faith."); *see also* 14A Couch on Ins. § 205:63 ("As a general rule, when an insurance company in good faith mistakenly refuses to defend a claim, it is not liable beyond the limits of its policy.").

The timing of Scottsdale's decision does not support an inference of bad faith.  *See, e.g.*, *State Farm Fire & Cas. Co. v. Ricci*, 947 N.Y.S.2d 265, 268 (4th Dep't 2012) (holding that a

delay of "approximately two years between the time [State Farm] reserved its right to disclaim or deny coverage and its commencement of this action" did not evidence bad faith.).  As a matter of policy, insurers must be given "latitude in investigating and resisting unfounded claims," *Schwartz*, 539 F.3d at 152 (quoting *Pavia*, 605 N.Y.S.2d at 212), and the timing of Scottsdale's reservation of its rights and denial of coverage are well within that latitude.

The content and circumstances of Scottsdale's decision also does not support an inference of bad faith.  McGrath's claim rests on nothing more than what is at best for McGrath a good faith but mistaken interpretation of the Watershed Policy by Scottsdale.  Each of McGrath and Scottsdale had powerful arguments for why, respectively, McGrath was an Insured and why he was not an Insured.  McGrath's arguments were accepted in this Court's earlier opinion. Scottsdale's arguments, which the Court ultimately rejected, were far from unreasonable.  They relied, in part, on the fact that Rocky Aspen described itself as a "joint venture" and that if it were considered a joint venture alone under the Watershed Policy coverage would not lie.  There was also some force, albeit not sufficient to carry the day, that McGrath—who was otherwise joint a business partner to Watershed—should not become a director or officer and entitled to coverage under the Watershed Policy simply by virtue of the fact that the entity which he controlled failed to meet its financial obligations to Watershed.  In the end, the contract language supported McGrath but that is not to say that a reasonable lawyer could not have reached a contrary judgment.

McGrath has not identified any facts that would suggest Scottsdale reached its judgment in bad faith.  Within weeks of McGrath asking Scottsdale for its position with respect to coverage, Scottsdale went to court and to seek declaratory judgment as to whether it or McGrath

was correct was correct in its contract interpretation.  *See Hugo Boss Fashions*, 252 F.3d at

622-25 (rejecting bad faith liability on similar facts).

        Finally, there is no genuine issue of fact supporting a claim that Scottsdale is liable for

bad faith failure to settle after McGrath tendered to Scottsdale the Trustee's settlement demand.

        Exclusive control over the claim at issue by the insurer is an essential element of any

claim for bad faith refusal to settle.  That is because "[t]he basis for judicial imposition on

liability insurers of a duty to exercise good faith or due care with respect to opportunities to settle

within the policy limits is that the company has exclusive control over the decision concerning

settlement within policy coverage, and company and insured often have conflicting interests as to

whether settlement should be made."  *Windmill Distrib. Co.*, 742 F. Supp. 2d at 263 (quoting

*Bourget v. Gov't Emp. Ins. Co.*, 456 F.2d at 285.  However, an insurer only "has exclusive

control over a claim against its insured once it assumes defense of the suit."  *Fed. Ins. Co. v. N.*

*Am. Specialty Ins. Co.*, 921 N.Y.S.2d 28, 29 (1st 2011); *see also New Eng. Ins. Co.*, 295 F.3d at

236 ("Because an insurance company has exclusive control over a claim against its insured *once*

*it assumes defense of the suit*, it has a duty under New York law to act in 'good faith' when

deciding whether to settle such a claim, and it may be held liable for breach of that duty.")

(quoting *Pinto*, 221 F.3d at 398) (emphasis added); *Quincy Mut. Fire Ins. Co. v. N.Y. Cent. Mut.*

*Fire Ins. Co.*, 89 F. Supp. 3d 291, 306 (N.D.N.Y. 2014) (the insurer's obligation to exercise good

faith in evaluating a settlement proposal, "which is implied under the insured's policy, is in

recognition of the reality that, when an insurer assumes the defense of a case, it positions itself to

control strategy and act on behalf of the insured.").  "[A] voluntary assumption of defense,"

meanwhile, "occurs when the insurer undertakes defense of an action against the insured without

disclaiming liability or reserving its rights as to known grounds of noncoverage under the policy

or where the insurer assumes the defense under a reservation of rights."  14 Couch on Ins. §

200:58.  Moreover, even where the insurer "accepts the duty to defend" only "under a

reservation of rights," it thereby "relinquishes control of the litigation to the insured."  *Id*. §

202:53; *see id*. ("A liability insurer may not reserve its rights to disclaim liability in a case and at

the same time insist on retaining control of its defense."); *cf. Federated Dep't Stores, Inc. v.

Twin City Fire Ins. Co.*, 807 N.Y.S.2d 62, 66 (2006) ("Where an insurer defends under a

reservation of rights, the insured is entitled to retain its own counsel.") (citations omitted).[3]

In this case, Scottsdale at no time exercised control or exclusive control over any claim

against McGrath.  *See U.S. Fid. & Guar. Co.*, 43 F. Supp. 3d at 281 (dismissing claim for bad

faith refusal to settle where there was "no evidence that [the insurer] exercised 'exclusive

control'" over the relevant settlement decision, and the purported insured "selected his own

counsel and . . . at no time did [the insurer] ever tell any of [the purported insured] that they

could not settle the claim with their own funds.").  When McGrath received the Trustee's offer to

settle in June 2019, Scottsdale did not assume defense of the action on McGrath's behalf or

exclusive control over the settlement decision.  Rather, on June 10, 2019, three days after

receiving notice of the claim and settlement demand from McGrath's counsel, Scottsdale

---

[3] A corollary is that "[i]f an insurer assumes the defense of an action and controls its defense on behalf of an insured with knowledge of facts constituting a defense to the coverage of the policy without reserving its right to deny coverage, the insurer is estopped from denying coverage at a later time, even if mistaken on the requirement of coverage."  *Utica Mut. Ins. Co. v. 215 W. 91st St. Corp.*,724 N.Y.S.2d 758, 759-60 (2001).  Notably, however, "[t]he reservation [of rights] is a sufficient preventative to reliance even if the insurer later disclaims on a basis different from the ground originally asserted in the reservation of rights."  *Federated Dep't Stores, Inc.*, 807 N.Y.S.2d at 67; *see Gelfman v. Capitol Indem. Corp.*, 39 F. Supp. 3d 255, 272 (E.D.N.Y. 2014) ("where, as here, the insurer defends the insured subject to a reservation of rights, the insured will not be heard to complain that he detrimentally relied on the insurer's representation of him: 'The purpose of a reservation of rights is to prevent an insured's detrimental reliance on the defense provided by the insurer.'") (quoting *Fed. Dep't Stores*, 807 N.Y.S.2d at 67).

inquired as to McGrath's position regarding his status as an insured and reserved its rights "under the Policy, in equity, and at law." *See* Dkt. No. 69-14 at 4-6.  On July 15, 2019, in response to another email from McGrath's counsel on the evening of July 12, 2019 which stated that the deadline to accept settlement was that day, Scottsdale responded provided reasons that it was denying coverage.

In short, Scottsdale did not exercise control over the settlement decision.  McGrath was free to settle his claim and subsequently seek indemnification against Scottsdale pursuant to the Watershed Policy, and he did not do so.  Although the Watershed Policy contains a provision that "Insureds agree not to settle or offer to settle any claim, incur any Costs, Charges and Expenses or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the prior written consent of the Insurer . . ." Dkt. No. 14-1 § F(3), Scottsdale waived its rights under that provision by failing to assume defense of the claim and by reserving its right to deny coverage.  *See Cardinal v. State*, 107 N.E.2d 569, 573 (N.Y. 1952) ("If an insurer unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured person's claim, and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent."); 31 N.Y. Prac., New York Insurance Law § 31:50 (21st ed. 2020) ("[a]n insurer's wrongful refusal to defend causes the insurer to forfeit its right to control the underlying litigation, including the right to prohibit settlement or compromise by the insured, although the insured must still act reasonably in this regard."); *see also* 14 Couch on Ins. § 202:53.  By the same token, because Scottsdale failed to assume defense of the claim, no claim can lie against it for bad faith refusal to settle.

Accordingly, Scottsdale's motion is granted insofar as McGrath may not pursue any claim for bad faith denial or coverage or failure to settle independent of its claim for breach of contract.

### B.    Damages

McGrath separately makes a prayer for consequential and punitive damages on his breach of contract claim.  Scottsdale seeks summary judgment on that prayer for relief.  *See* Dkt. No. 63 at 14-18.  Scottsdale claims that the damages available to McGrath should be limited to the Policy limit.  The issue is analytically distinct from the question whether Scottsdale is liable for an independent claim for bad faith refusal to settle or denial of coverage.  *Compare Pavia*, 605 N.Y.S.2d at 210-11 and *Hugo Boss Fashions*, 252 F.3d at 624 *with Bi-Economy Market, Inc. v. Harleysville Ins. Co. of N.Y.*, 856 N.Y.S.2d 505 (2008).  McGrath argues, and some courts have held, that under some circumstances an insurer can be liable beyond its policy limits on a breach of contract claim alone.  *See Bi-Economy Market, Inc.*, 856 N.Y.S.2d at 505.  But the analysis is largely the same.  If McGrath cannot recover consequential or punitive damages on a claim of bad faith liability, he cannot avoid the restrictions that New York law places on that claim by seeking such damages on a breach of contract theory alone.  The Court grants Scottsdale's motion and strikes the prayer for relief seeking consequential and punitive damages.

### 1.    Consequential damages are not available.

The law regarding the availability of consequential damages for a breach of contract dates back to the canonical decision in *Hadley v. Baxendale*.  9 Ex. 341, 156 Eng. Rep. 145 (1854); *see* 1 New Appleman New York Insurance Law § 10.09 (2021) ("With respect to general consequential damages, New York follows the time-honored rule of *Hadley v. Baxendale* that for damages to be awardable, they must either arise naturally from the breach of the contract or be contemplated by both parties at the time they made the contract.  Under this standard,

consequential damages have generally been difficult to obtain in New York for breach of a first-party insurance contract."); *Kenford*, 540 N.Y.S.2d 1, 3-4 (1989).  To recover consequential damages, "such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."  *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 n.3 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Kenford*, 540 N.Y.S.2d at 3-4).  "To determine whether consequential damages were reasonably contemplated by the parties, courts must look to the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made." *Kenford*, 540 N.Y.S.2d at 4.  Further, consequential damages "must be proven by the party seeking them."  *E. Coast Res., LLC v. Town of Hempstead*, 707 F. Supp. 2d 401, 411 (E.D.N.Y. 2010) (quoting *Bi-Economy Market, Inc.*, 856 N.Y.S.2d at 509).  The proof cannot be "speculative or conjectural."  *Bi-Economy*, 856 N.Y.S.2d at 508 (citations omitted); *see also Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, 566 F. App'x 29, 32 (2d Cir. 2014) (quoting *Bi-Economy*, 856 N.Y.S.2d at 508).

Historically, both first-party and third-party insureds suing in New York for an insurer's breach of contract in failing to pay a claim were limited to recovery within the policy limits of the policy which they purchased.  *See, e.g. Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 2003 WL 22144316, at *3 (S.D.N.Y. Sept. 17, 2003) ("The Second Circuit Court of Appeals, the New York Court of Appeals, other courts in the Southern District, and this court have all held consistently that [consequential] damages are unavailable in insurance cases, unless the plaintiff alleges that the specific injury was of a type contemplated by the parties at the time of

contracts.") (citing cases).   The logic was that where the agreement was one to pay, i.e., a contract for money only, the plaintiff generally is limited to recovery of the contract amounts plus interest.  *See Trs. of Columbia Univ. in City of N.Y. v. D'Agostino Supermarkets, Inc.*, 138 N.Y.S.3d 498, 492-93 (2020) (citing with approval cases for proposition that where the agreement is to pay recoverable damages are limited to contract amount plus interest); 14A Couch on Ins. § 207:72 ("There is . . . authority . . . that damages for failure or delay in making payment under an insurance contract are limited to the amount owing under the contract plus interest, unless the breach is accompanied by an independent tort.").  In other words, where the insured contracts for advancement of defense costs and indemnification up to a specified policy limit, the most that the insured was historically entitled to receive is the policy limit and the most it was entitled to in damages for a breach of contract action is the money it was not paid.  *See Bi-Economy Market Inc.*, 856 N.Y.S.2d at 512 (Smith, J., dissenting).[4]  The loss of the time value of money would be covered, under New York law, by the availability of an award of pre-judgment interest.  *See Trs. of Columbia Univ. in City of N.Y.*, 138 N.Y.S.3d at 502.  The law does not penalize an insurer for its mistaken judgment regarding the coverage of its policy by exposing it to a greater loss than it agreed to in that policy.  *See, e.g., Jane Street Holding, LLC*, 2014 WL 28600, at 10-11.  There is a further policy justification for the rule: it protects insurers from the risk that "juries [would] view even legitimate claim denials unsympathetically . . . [which would] inevitably lead insurers to increase their premiums—and so w[ould] inflict a

---

[4] Similarly, where the insurer breaches a duty to defend a claim against the insured and indemnify it against judgment, it "may be held liable for the expenses the insured incurred in providing for his own defense" up to the policy limit. *U. S. Fid. & Guar. Co. v. Copfer*, 424 N.Y.S.2d 356, 357 (1979).

burden on every New Yorker who buys insurance." *Bi-Economy*, 856 N.Y.S.2d at 511 (Smith, J., dissenting).

In *Bi-Economy Market, Inc. v. Harleysville Insurance Co. of New York*, 856 N.Y.S.2d at 505, the New York Court of Appeals carved a limited exception to that general rule. *Bi-Economy* was a first-party insurance case. It involved business interruption insurance which covered the actual loss of business income due to the suspension of the insured's business during a period following a physical loss or damage, up to one year. *Id.* at 507. As described above, in the first-party insurance context, there is no independent claim available for bad faith denial of insurance coverage. *See N.Y. Univ.*, 639 N.Y.S.2d at 286; *Harris v. Provident Life Ins.*, 310 F.3d 73, 80 (2d Cir. 2002) (stating that cases in which "an insurance company refuses to settle a claim against the insured" are "inapposite" in the first-party insurance context, where "there is no claim against [the plaintiff]; rather, [the plaintiff] herself is the claimant"). *Bi-Economy* did not disturb that well-established precedent, but addressed the availability of consequential damages—which may exceed the applicable policy limit—for breach of an insurance contract.

The court held that the plaintiff could recover consequential damages based on the facts it alleged and type of policy it purchased and the language of that policy. In the view of the Court of Appeals, the purpose of the policy was "to ensure that [the insured] had the financial support necessary to sustain its business operations in the event disaster occurred." *Bi-Economy*, 856 N.Y.S.2d at 509. What the insured did with its payment was not "external and irrelevant to the contract," rather, "the purpose of the agreement—what the insured planned to do with its payment—was at the very core of the contract itself." *Id.* at 508-09. A family-owned wholesale and retail meat market suffered a complete loss of inventory and heavy structural damage causing a business interruption following a major fire. In response to a notice of claim, the

insurer advanced a sum compensating the insured only for seven months of lost business income despite the fact that the policy provided for a full 12 months. *Id.* at 507. As a result of the insurer's bad-faith delay in paying and bad-faith failure to pay the full amount of the lost business income claim, the meat market never resumed operations. The court held that the insured could seek damages for the collapse of its business, ruling that the very purpose of business interruption coverage was to ensure *Bi-Economy* "had the financial support necessary to sustain its business operation in the event disaster occurred" and that limiting damages to the amount of the policy, without consequential damages, would "not place the insured in the position it would have been in had the contract been performed." *Id.* at 509-10. Noting that "[a]s in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims," the court found that "the very purpose of business interruption coverage would have made [the insurer] aware that if it breached its obligations under the contract to investigate in good faith and pay covered claims it would have to respond in damages to Bi-Economy for the loss of its business as a result of the breach." *Id.* at 510 (internal quotation marks and citations omitted). The court held that the contractual exclusions for certain consequential losses did not demonstrate the parties' intent to limit the insureds to the policy limits. *Id.*

On that same date, in *Panasia Estates, Inc. v. Hudson Insurance Co.*, 856 N.Y.S.2d 513 (2008), the Court of Appeals affirmed the Appellate Division's judgment holding that an insurer was not entitled to summary judgment on the claim that consequential damages were unavailable on a policy that included builders' risk coverage. Relying on *Bi-Economy*, the court held that "consequential damages resulting from a breach of the covenant of good faith and fair dealing

23

may be asserted in an insurance contract context, so long as the damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contract,'" *id.* at 515 (quoting *Bi-Econ*, 856 N.Y.S.2d at 508).  It concluded that "the courts below failed to consider whether the specific damages sought by Panasia were foreseeable damages as the result of [the insurer's] breach."  *Id.*

Courts have subsequently relied on *Bi-Economy* and *Panasia* to permit consequential damages where they determined that damages alleged in excess of the policy limit were within the contemplation of the parties at the time of contracting.  For example, in *Woodworth v. Erie Insurance Co.*, 743 F. Supp. 2d 201, 218 (W.D.N.Y. 2010), the court applied the reasoning of *Bi-Economy* to a homeowner's insurance policy.  The policy covered the costs for the plaintiff to rebuild or replace their home and additional living expenses for a period of twelve months after the loss.  The plaintiff's insureds sought living expenses in excess of the twelve months claiming that they were forced to incur such expenses by reason of the defendant's breach of the policy in failing to pay the proper actual cash value for the loss.  The court denied the insurer's request for summary judgment limiting the insureds to the policy limits relying on *Bi-Economy*.  The court stated "the clear purpose of the insurance policy was to insure that Plaintiffs' house would be rebuilt or replaced promptly, and that in the meantime, Plaintiffs would not have to pay additional living expenses while the old house was uninhabitable," and that the policy "appear[ed] to envision that such repair or replacement would occur in twelve months or less, and the parties do not dispute that such repair or replacement could have been completed within that time."  *Id.* at 217.   Applying the reasoning of *Bi-Economy*, it concluded, "the very purpose of additional living expense coverage would have made Defendant aware that if it failed to act in good faith, and breached the policy in such a way as to hinder Plaintiffs from rebuilding their

home, it would cause Plaintiffs to incur additional living expenses until such time as the house

was replaced" and that therefore, Plaintiffs could potentially pursue their claim for additional

living expenses as consequential damages." *Id.* at 218, *rev'd on reconsideration in part,* 2011

WL 98494 (W.D.N.Y. Jan. 12, 2011).

More recently, in *D.K. Property, Inc. v. National Union Fire Insurance Co.*, 92 N.Y.S.3d

231 (1st Dep't 2019), similarly, the court considered whether a commercial insurance policy that

covered physical loss or damage to plaintiff's building permitted an award of consequential

damages.  The consequential damages involved costs that the plaintiff incurred for the damage

caused to the building during a three-year period after the property damage occurred while the

defendant rather than paying the claim "made unreasonably and increasingly burdensome

information demands" as "a tactic . . .  to make the claim so expensive to pursue that plaintiff

would abandon it altogether." *Id.* at 233.  The court reiterated the principle that consequential

damages "ultimately rest on what liability the insured is found to have 'assumed consciously,' or

from the plaintiff's point of view, . . . warranted the plaintiff to reasonably suppose the insurer

assumed when the insurance contract was made." *Id.*.  The court sustained the claim against a

motion to dismiss because New York law did not require the complaint to do more than

"specif[y] the type[] of consequential damages claimed and alleg[e] that such damages were

reasonably contemplated by the parties prior to contracting." *Id.* at 232.[5]  *See also Roman Cath.*

---

[5] The court held that New York law did not impose a "heightened pleading standard" requiring
the plaintiff to plead why the consequential damages "alleged were reasonable and foreseeable at
the time of contract." *Id.* at 233.  It also reasoned that under the policy at issue the "insured's
obligation to 'take all reasonable steps to protected the covered property from further damage by
a covered cause of loss' support[ed] plaintiff's allegation that some or all the alleged damages
were foreseeable" when the consequential damages consisted, at least in part, of the continuing
and increasing damage to the property during the period when the insurer was withholding
payment on the claim. *Id.* at 23 (quoting *Benjamin Shapiro Realty Co. v. Agric. Ins. Co.*, 731
N.Y.S.2d 453 (1st Dep't 2001)).

*Diocese of Rockville Centre v. Gen. Reinsurance Corp.*, 2016 WL 5793996, at *5 (S.D.N.Y. Sept. 23, 2016) (applying *Bi-Economy* to a workers compensation policy and stating: "Following *Bi-Economy* and *Panasia*, this district has held that in order to satisfy this foreseeability requirement for consequential damages on a breach of contract claim, the policyholder need not point to an express contract provision or specific language permitting the recovery of consequential damages.  Rather, the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject.") (internal quotation marks and citations omitted).

Federal courts interpreting New York law have also highlighted the importance of bad faith to claims for consequential damages after *Bi-Economy*.  *See, e.g.*, *Dahlinger v. First Am. Specialty Ins. Co.*, 2020 WL 1511261, at *1, *4 (N.D.N.Y. Mar. 30, 2020) (plaintiff, whose home was damaged by a broken plumbing line, failed to adequately plead "the bad faith necessary to state a claim for consequential damages"); *Bryant v. Gen. Cas. Co. of Wisc.*, 2019 WL 367292, at *1,*4-5 (N.D.N.Y. Jan. 30, 2019) (dismissing consequential damages in a case involving a commercial building's collapse and defendant's refusal to pay because, while the pleading "include[d] a few paragraphs that could be read as being suggestive of bad faith," the court reasoned that one paragraph was "wholly conclusory," another was "totally circular," and "[t]he other *facts* alleged amount, at best, to an accusation that defendant did not satisfy the insurance claim in the amount, or on the precise timeline, that plaintiff believed to be appropriate under the circumstances.").

There has been some disagreement among courts and commentators about the analytic moorings of *Bi-Economy*.  Some have viewed it as turning on the Court of Appeals' finding of bad faith or, in the words of the Court of Appeals, on a violation of what it called the duty of

good faith.[6]  *See, e.g.*, *Dahlinger*, 2020 WL 1511261, at *4; *Bryant*, 2019 WL 367292, at *4-5;

Charles Platto, Joseph Grasso, Rachel Lebejko Priester & Alison Weir, *What Is the Law of Bad*

*Faith in New York Two Years After* Bi-Economy *and* Panasia – *Have The Questions Been*

*Answered?*, 32 No. 3 Ins. Litig. Rep. 69, 73-74 (2010).  On that analysis, it is a variant of the

claim for bad faith refusal of coverage—albeit applied to a pure breach of contract claim.  Others

have viewed it as applying a more conventional contract damages analysis, i.e., based on the

particulars of the policies at issue in *Bi-Economy* and *D.K. Property*, the damages sought were

within the reasonable contemplation of the parties at the time of contracting.  *See, e.g.*, Bi-

Economy Market, Inc. v. Harleysville Insurance Co.: *New York Court of Appeals Holds that*

*Insurers May be Liable for Consequential Damages*, 122 Harv. L. Rev. 998, 1001-1005 (2009);

Jay M. Levin, Lisa A. Szymanski, *Consequential Damages Resulting from an Insurer's Breach*

*of Contract*, The Brief, 46, 46 (2012).  Some have viewed it as limited to first-party insurance

claims.  *See, e.g.*, Platto et al., *supra* at 74.  In a third-party context, the well-developed body of

law regarding bad faith refusal to defend, settle, or indemnify provides guideposts to courts and

contracting parties regarding when a party is entitled to damages in excess of policy limits—

---

[6] The Court notes this is a slight misnomer: The duty of good faith and fair dealing is a doctrine that reads into a contract a term that is not expressed but is necessary to give the agreement meaning and to prevent it from being illusory.  *See S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 2021 WL 621235, at *6-10 (S.D.N.Y. Feb. 17, 2021) (discussing the relationship between the duty of good faith and fair dealing and the express terms of a contract).  It does not import a generalized code of good conduct into the law of contracts.  See id., at *7 (covenant is only breached where (1) its application would not "negate the terms of a bargained-for clause"; and (2) the application of the covenant is "necessary to preserve the fruits of the contract and prevent it from being illusory"); see also  Bi-Economy, 856 N.Y.S.2d at 505 (Smith, J., dissenting) ("The majority also departs from the established understanding of the 'covenant of good faith and fair dealing' . . . Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain. . . . [T]his is the first time, as far as I know, that we have relied on that implied covenant to condemn the bad faith breach of an express promise.").

guideposts not available in the first-party context in which such claims cannot lie.  *Compare Pavia*, 605 N.Y.S.2d at 210-11 *and Hugo Boss Fashions*, 252 F.3d at 624 *with N.Y. Univ.*, 639 N.Y.S.2d at 286-90; *see Harris*, 310 F.3d at 80.  The doctrine of *Bi-Economy* cannot be used to resurrect a failed bad-faith refusal claim.  On any analysis, Scottsdale is entitled to summary judgment.

The facts here fall far outside those alleged and at issue in *Bi-Economy* and *D.K. Property*.  This is not a case where the insurer engaged in a bad faith delay of payment and then only paid the insured a small portion of that to which it was entitled while the asset that was insured continued to deteriorate in value, *see Bi-Economy*, 856 N.Y.S.2d at 508; *Simon v. Unum Grp.*, 2009 WL 2596618, at *7-8 (S.D.N.Y. Aug. 21, 2009) (granting summary judgment on a consequential damages claim because the plaintiff "failed to offer any evidence to show that defendants acted in bad faith when they denied his claim" and that he "cannot sustain a claim for consequential damages without showing that defendants lacked good faith in processing his claim.").  Nor is it a case in which the insurer engaged in a three-year campaign to deter the insured from pursuing its claim, *see D.K. Property*, 92 N.Y.S.3d at 233.  It is undisputed that McGrath first provided Scottsdale with notice of a claim in June 2019, Scottsdale responded three days later reserving its rights, and denied coverage one month after that.  McGrath claims that "it was reasonably foreseeable to Scottsdale that McGrath as a Manager of one of Watershed's Subsidiaries would require defense and settlement of Claims asserted against him," Dkt. No. 67 at 23, and that "in reading the [Watershed] Policy it is clear from its face that it is entirely foreseeable that a Director or Officer will require defense and settlement of claims under the Policy."  *Id.*  The same allegations could be made in any case in which the insurer and the insured differ as to coverage—the insured will always believe that the policy clearly covers his

claim.  In this case, the policy was not "clearly" in McGrath's favor.  He prevailed because the Court held that his interpretation was the better interpretation not because it was the only interpretation that one could colorably advance.

This also is not a case where it can be said that the consequential damages McGrath seeks fall within the reasonable contemplation of the parties at the time of contracting.  McGrath was a beneficiary of a directors and officers insurance policy that indemnified him to the limits of liability for a loss incurred as a result of a wrongful act engaged in by him while acting in his capacity as a manager of Rocky Aspen  during the short window between the time the Watershed Option became exercisable and when it was exercised and he was removed,  The Court has concluded that that policy imposed a duty on the insurer, upon receiving appropriate notice, to defend any claim.  It was not at the "very core of the contract" that McGrath spend the costs that the insurer was required to advance or the payment it would be required to make in any particular manner.  Money is fungible.  McGrath could have gone out of pocket to fund a settlement with Hanford and the Trustee and used the insurance payment, once received, to repay himself or for any other purpose.  The contract thus fits squarely within those the courts have characterized as an "'agreemen[t] to pay'—contracts for money only—where the only recoverable damage for breach is interest" because "what the payee plans to do with the money is external and irrelevant to the contract itself."  *Bi-Economy Market, Inc.*, 856 N.Y.S.2d at 508.  Scottsdale was entitled to disclaim coverage and seek a declaratory judgment that McGrath was not an insured.  The fact that it did so and lost does not expose it to liability beyond the limits to which it agreed and which was reasonably contemplated when the policy was issued.  *See, e.g.*, *Jane Street Holding, LLC*, 2004 WL 28600, at *11 ("Any consequential damages . . . were not contemplated by both parties at the time of execution."); *Int'l Rehab. Scis. Inc. v. Gov't Emps.*

*Ins. Co.*, 2014 WL 6387276, at *3 (W.D.N.Y. Nov. 14, 2014) (denying claim for consequential damages where "plaintiff does not point to any provision in GEICO's no-fault insurance policies underlying the instant claims which purposes to cover consequential damages"); *Paterra v. Nationwide Mut. Fire Ins. Co.*, 831 N.Y.S.2d 468, 470 (2d Dep't 2007) (determining, on an appeal from a motion to dismiss, that "[c]ontrary to the plaintiffs' contentions, they do not have a claim for consequential damages beyond the limits of the policy for the claimed breach of contract"). McGrath has not shown that consequential damages were "brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Harris*, 310 F.3d at 80 n.3. Accordingly, Scottsdale's motion for summary judgment dismissing the prayer for consequential damages is granted.

### 2.     Punitive damages are not available.

The final issue before the Court on this motion is whether McGrath has presented a triable claim for punitive damages.

Under New York law, damages arising from the breach of a contract are "ordinarily limited to the contract damages necessary to redress the private wrong," but "punitive damages may be recoverable if necessary to vindicate a public right." *N.Y. Univ.*, 639 N.Y.S.2d at 287 (citing *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 612 N.Y.S.2d 339, 342 (1994)). Punitive damages are available only where they are "necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Id.* (quoting *Rocanova*, 612 N.Y.S.2d at 342). The elements required to state a claim for punitive damages are: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature . . . ; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public." *Matter of Part 60 Put-Back Litig.*, 141

N.Y.S.3d 410, 422 (2020) (internal quotation marks omitted) (quoting *N.Y.Univ.*, 639 N.Y.S.2d at 287).  Further:

> Where a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract. . . . [T]he defendant must have engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations.

*Id*.

For the reasons stated above, McGrath fails at the threshold: he does not identify any tort independent of the contract.  *See supra*; *N.Y. Univ.*, 639 N.Y.S.2d at 287 (concluding that because the amended complaint failed to state a tort independent of the contract, the court had "no occasion to address the sufficiency of the complaint's claim for punitive damages under the remaining prongs . . . ."); *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 94 n.10 (2d Cir. 2005) ("[O]ur dismissal of TVT's tort claims necessarily means that appellants' conduct was not actionable as an independent tort.  This additional reason also warrants setting aside the award of punitive damages on TVT's contract claim.") (internal quotation marks, alterations, and citations omitted); *Brown v. Paul Revere Life Ins. Co.*, 2001 WL 1230528, at *5 (S.D.N.Y. Oct. 16, 2001) ("[E]ven if I make the extremely generous assumption that the other elements of the *New York Univ.* test are satisfied, plaintiff's failure to allege a tort independent of the contract is fatal to his proposed new claim.").  Accordingly, Scottsdale's motion for summary judgment dismissing the prayer for punitive damages is granted.

## CONCLUSION

The motion for partial summary judgment is GRANTED and the second counterclaim and the prayer for consequential and punitive damages are dismissed.

The Clerk of Court is respectfully directed to close Dkt. No. 62.

SO ORDERED.

Dated: July 19, 2021
        New York, New York

LEWIS J. LIMAN
United States District Judge