UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
SCOTTSDALE INSURANCE COMPANY,                               :
:
                                    Plaintiff,             :
:
                                                           :
            -v-                                            :
:
PATRICK MCGRATH, AH DB KITCHEN                              :
INVESTORS LLC, and CASTLEGRACE EQUITY                       :
INVESTORS, LLC,                                            :
:
                                    Defendants.           :
:
------------------------------------------------------------------X
:
PATRICK MCGRATH,                                           :
:
                                    Third-Party Plaintiff, :
:
            -v-                                            :
:
SCOTTSDALE INSURANCE COMPANY,                               :
:
                                    Third-Party Defendant. :
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/2/2025__

19-cv-7477 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

        Plaintiff Scottsdale Insurance Company ("Scottsdale") moves, pursuant to Federal Rule

of Civil Procedure 56, for summary judgment as to all remaining causes of action in the

Complaint and as to the remaining counterclaim of Defendant/Counterclaimant Patrick McGrath

("McGrath").  Dkt. No. 169.  McGrath cross-moves for summary judgment.  Dkt. No. 175.

        For the following reasons, Scottsdale's motion for summary judgment is granted in part

and denied in part.  Scottsdale's motion for summary judgment is granted as to its claims against

defendant AH DB Kitchen Investors LLC ("AH DB") and defendant Castlegrace Equity

Investors, LLC ("Castlegrace") and as to McGrath's counterclaims for breach of the duty to defend. The Court declines to address Scottsdale's request for a declaratory judgment regarding its duty to defend McGrath, which is redundant given the holding on McGrath's counterclaims. McGrath's motion for summary judgment is denied.

## BACKGROUND

The following facts are drawn from the parties' Rule 56.1 statements and underlying exhibits as well as the Court's previous summary judgment opinions. They are undisputed unless otherwise stated.

## I.    The Underlying Venture

McGrath is an individual who was a citizen of New York at the time this action was filed. Dkt. No. 179 ¶ 1.[1] McGrath is the sole member of defendant Castlegrace. *Id.* ¶ 4. McGrath is also the sole member of Aristone Hospitality ("Aristone"). *Id.* ¶ 2. Aristone is the sole member of defendant AH DB. *Id.* ¶ 3.

Scottsdale issued a Business and Management Indemnity Policy numbered EKS3172343 (the "Policy") to Watershed Ventures, LLC ("Watershed"), effective for the period from November 6, 2015, to November 6, 2016. Dkt. No. 179 ¶ 16. As further described below, the Policy insured the directors and officers of Watershed and its subsidiaries for certain losses not indemnified by the company. *See* Dkt. No. 169-8 ("Policy").

This case arises out of a business venture between entities owned by McGrath and entities owned by Watershed. On or around April 24, 2013, AH DB and Rocky Aspen Management 204, LLC ("RAM 204"), a wholly-owned subsidiary of Watershed, formed Rocky

---

[1] The parties' joint statement of undisputed facts is organized as a table with numbered rows. Dkt. No. 179. The Court construes each row as a numbered paragraph pursuant to Local Civil Rule 7.1.

Aspen, LLC ("Rocky Aspen").  *Id.* ¶ 5.  Rocky Aspen was formed to open and operate a restaurant in Aspen, Colorado.  *See Scottsdale Ins. Co. v. McGrath*, 506 F. Supp. 3d 216, 219 (S.D.N.Y. 2020).  AH DB and RAM 204 were the sole members of Rocky Aspen, with each owning 50% of the company by voting percentage interest.  *Id.*  McGrath was appointed by AH DB as a manager of Rocky Aspen.  *Id.* at 220.

Rocky Aspen was governed by an operating agreement which required AH DB to make certain capital contributions no later than March 25, 2015.  Dkt. No. 179 ¶ 7.  A default on these financial commitments would result in AH DB immediately forfeiting its voting units.  *See Scottsdale Ins.*, 506 F. Supp. 3d at 220.  AH DB did not satisfy its funding obligations to Rocky Aspen, and it accordingly forfeited its voting units in Rocky Aspen on March 26, 2015.  *Id*. However, McGrath was not removed as a manager of Rocky Aspen.  *Id.*  The Court has previously held that because Watershed controlled Rocky Aspen at this time, and McGrath was a manager of Rocky Aspen, McGrath was an Insured under Watershed's Policy.  *Id.* at 224.  On January 5, 2016, RAM 204 sent a letter to McGrath stating that he was removed as a manager. *Id.* at 220.

## II.    The Policy

The Policy was effective for the period from November 6, 2015, to November 6, 2016 (the "Policy Period").  Dkt. No. 179 ¶ 16; *see* Policy at 4.[2]  The Policy provides coverage for:

> "Loss" of "Directors and Officers" for which the "Directors and Officers" are not indemnified by the "Company" and which the "Directors and Officers" have become legally obligated to pay by reason of a "Claim" first made against the "Directors and Officers" during the Policy Period or, if elected, the "Extended Period," and reported to Scottsdale pursuant to Section E(1) [of the Policy], for any "Wrongful Act" taking place prior to the end of the Policy Period.

Dkt. No. 179 ¶ 17; *see* Policy Insuring Clause A.1.

---

[2] ECF pagination.

"Directors and Officers" is defined to include "a duly elected or appointed director, officer, or similar executive of the Company," and an employee or contractor of the Company. Dkt. No. 179 ¶ 18.  The "Company" is defined to include Watershed and any "Subsidiary."  *Id.* ¶¶ 19–20.  Subsidiary is defined as an entity "of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by [Watershed]" and "any joint venture entity in which [Watershed] has an exact fifty percent (50%) ownership . . . [and] solely controls the management and operations."  *Id.* ¶ 22.  The Court has already held that after March 25, 2015, Rocky Aspen was a Subsidiary within the meaning of the Policy.  *Scottsdale Ins.*, 506 F. Supp. 3d at 224–25.

"Claim" is defined to mean, among other things, "a written demand against any Insured for monetary damages or non-monetary or injunctive relief" and "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading."  Dkt. No. 179 ¶ 22; *see* Policy D&O Coverage Section B.1.

"Wrongful Act" is defined to mean, in pertinent part, "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any Director or Officer solely by reason of his or her serving in such capacity."  Dkt. No. 179 ¶ 23; *see* Policy D&O Coverage Section B.9.

"Loss" is defined to include "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges, and Expenses[3] incurred by Directors and Officers."  Policy D&O Coverage Section B.7.  Loss does not include:

a.  taxes, fines, or penalties;

b.  matters uninsurable under the laws pursuant to which this Policy is construed;

c.  punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the Insureds, Insurer, this Policy or the Claim giving rise to such damages;

d.  the cost of any remedial, preventative, or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement, or governmental authority;

e.  any amount for which the Insured is not financially liable or legally obligated to pay.

*Id.*

Section E.1 of the Policy, which governs notification, states that:

The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give Insurer written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after the end of the Policy Period.  If any Claim is first made against the Insureds during the Extended Period, if purchased, written notice to Insurer must be given as soon as practicable, but in no event later than sixty (60) days after the end of the Extended Period.

*Id.* E.1.

Exclusion C.1.h. of the Policy's D&O Coverage (the "Subsidiary Exclusion") excludes coverage for Loss on account of certain Claims against Subsidiaries.  *Id.* C.1.h.; Dkt. No. 179 ¶ 25.  Specifically, it excludes coverage for Loss on account of Claims:

---

[3] "Costs, Charges and Expenses" means "reasonable and necessary legal costs, charges, fees, and expenses incurred by any of the Insureds in defending Claims."  *Id.* B.3.

[A]gainst any of the Directors and Officers of any Subsidiary or against any Subsidiary alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed or attempted by a Subsidiary or Directors and Officers thereof:

i. before the date such entity became a Subsidiary or after the date such entity ceased to be a Subsidiary; or

ii. occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring before the date such entity became a Subsidiary, would constitute Interrelated Wrongful Acts.

*Id.*; *see* Policy D&O Coverage Section C.1.h. "Interrelated Wrongful Acts" means "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes." Policy D&O Coverage Section B.6.

The Policy contains a warranty that "the particulars and statements contained in the Application are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy." Policy General Terms and Conditions Section D.1. The Insureds agree that the statements in the Application are deemed material to the Insurer's acceptance of the risk and that "in the event the Application . . . contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by Insurer under this Policy, this Policy . . . shall be void ab initio with respect to any Insureds who had knowledge of such misrepresentation or omission." *Id.*

Section F.3 of the Directors and Officers Coverage Section provides that:

Insureds agree not to settle or offer to settle any Claim, incur any Costs, Charges and Expenses or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any settlement, Costs, Charges and Expenses, assumed obligation or admission to which it has not consented. The Insureds shall promptly send to the Insurer all settlement demands or offers received by any Insured from the claimant(s).

6

Policy D&O Coverage Section F.3.

## III.    Relevant Proceedings and Claims

Rocky Aspen went bankrupt in early 2016, leading to a variety of claims against

McGrath and associated entities.  Scottsdale and McGrath seek determinations regarding

Scottsdale's duty to defend McGrath under the Policy with regard to two primary claims.[4]

### A.    Hanford Third-Party Claims

The first dispute between the parties focuses on whether Scottsdale has a duty to defend

McGrath against claims filed by Hanford Holdings LLC ("Hanford") in a proceeding in the

United States District Court for the Southern District of New York.  *See Rocky Aspen*

*Management 204 LLC v. Hanford Holdings LLC* ("*Hanford Litigation*"), 16-CV-4270

(S.D.N.Y.).  This proceeding was commenced by RAM 204 against Hanford on June 8, 2016,

---

[4] In addition to the claims discussed below, McGrath argues that he is entitled to legal fees arising out of a complaint filed against him and Hanford by Watershed and Rocky Aspen on May 3, 2016, in New York State Supreme Court, which McGrath labels the "TRO Action."  Dkt. No. 175 at 55; Dkt. No. 181 at 7.  However, Scottsdale did not seek a declaratory judgment regarding this proceeding, and McGrath did not allege in his counterclaims that Scottsdale had a duty to defend this proceeding.  McGrath's counterclaims for breach of the duty to defend discuss only the "Hanford Claims," which are defined as the counterclaims filed by Hanford in the Southern District of New York on July 27, 2016, Dkt. No. 14 ¶ 90, a claim filed by Watershed against McGrath in the Rocky Aspen bankruptcy on April 16, 2016, *id.* ¶ 92, and the Demand by the Trustee in bankruptcy on June 7, 2019, *id.* ¶¶ 106–109.  Indeed, despite the fact that this case has been pending for approximately six years and was fully prepared by the parties for trial, it is not clear that McGrath has ever mentioned the theory that Scottsdale has a duty to defend the TRO Action.  *See* Dkt. No. 131 (summarizing relevant facts in joint pretrial order without mentioning the TRO Action); Dkt. No. 137 (arguing only that Scottsdale had a duty to defend McGrath in other proceedings).  The Court has already held that consequential damages are unavailable in this case.  *See Scottsdale Ins. Co. v. McGrath*, 2024 WL 4512210, at *7 (S.D.N.Y. Oct. 17, 2024).  McGrath cannot recover for the defense of a proceeding that was nowhere alleged in his counterclaims.  *See Caro Cap., LLC v. Koch*, 653 F. Supp. 3d 108, 120 (S.D.N.Y. 2023) ("A party cannot amend their complaint simply by alleging new facts and theories in their memoranda opposing summary judgment."); *Greenidge v. Allstate Ins. Co*., 446 F.3d 356, 361 (2d Cir. 2006); *Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 32 (2d Cir. 2018) (summary order) (affirming district court's decision not to consider a theory of liability that was not alleged in plaintiff's complaint).

seeking a declaratory judgment that it, and not Hanford, is the owner of a majority of the membership interests in Rocky Aspen. Dkt. No. 179 ¶ 34; *see Hanford Litigation*, Dkt. No. 1 ¶ 1. McGrath was not named as a party in the original complaint.

On July 27, 2016, Hanford filed an answer with counterclaims and third-party claims (the "Hanford Complaint"). Dkt. No. 169-4. Hanford's counterclaims and third-party claims accused McGrath, AH DB, Castlegrace, Aristone, and individuals and entities associated with Watershed of numerous torts and statutory violations in connection with a series of loans Hanford made to Rocky Aspen. *Id.*[5] In support of these allegations, Hanford alleged the following.

### 1. The Hanford Complaint

The Hanford Complaint defines Watershed, RAM 204, and associated individuals as the "Watershed Defendants." *Id.* ¶ 12. It defines McGrath, AH DB, Aristone, and Castlegrace as the "Aristone Defendants." *Id.*

When Rocky Aspen was formed in April 2013, McGrath and Watershed originally intended to establish a restaurant associated with celebrity chef David Burke, who was partner, manager, and CEO of Watershed. *Id.* ¶¶ 9, 17–18. Rocky Aspen's operating agreement provided that RAM 204 would facilitate Burke's involvement and provide industry and management expertise, while AH DB would provide necessary capital. *Id.* ¶ 21. McGrath and a Watershed representative were named co-managers with authority to bind and transact business on behalf of Rocky Aspen. *Id.* ¶ 20.

Watershed's other members ousted Burke in November 2013. *Id.* ¶ 26. At that time and continuing through December 2014, Rocky Aspen had difficulty paying contractors retained to

---

[5] Hanford filed an amended answer and third-party complaint on January 4, 2019, after certain claims were dismissed by the court on June 28, 2018. Dkt. No. 169-5. The amended answer and third-party complaint alleges the same basic narrative and claims as the original answer and third-party complaint. *Compare* Dkt. No. 169-4 *with* Dkt. No. 169-5.

build the restaurant and became embroiled in related litigation. *Id.* ¶ 29.  AH DB was obligated by the terms of Rocky Aspen's operating agreement to provide additional capital to meet increased expenses, but it had difficulty doing so. *Id.* ¶ 30.  On December 1, 2014, Watershed provided AH DB with a loan of $700,000 which would mature thirty days later, on December 31, 2014 (the "Watershed Loan"). *Id.* ¶ 31.  McGrath personally guaranteed the loan. *Id.*  In conjunction with the loan, the Watershed Defendants and Aristone Defendants amended Rocky Aspen's operating agreement to state that if AH DB was unable to provide additional funding, RAM 204 would be permitted to seize control of Rocky Aspen by purchasing an 9,000 additional economic units and 9,000 voting units, thereby diluting AH DB's 50% ownership to 5%, removing AH DB's voting rights, and replacing AH DB's appointed co-manager (the "Watershed Option"). *Id.* ¶ 32.[6]  AH DB was unable to repay the loan on December 31, 2014. *Id.* ¶ 34.  Later, on or about March 20, 2015, the Watershed Defendants and Aristone Defendants again amended the operating agreement to increase AH DB's required contribution and provide that the Watershed Option would become exercisable on March 25, 2015, if AH DB did not provide this contribution. *Id.* ¶ 35.

In the first quarter of 2015, McGrath approached Hanford for a loan. *Id.* ¶ 36.  Hanford also describes this approach as an "investment pitch." *Id.* ¶ 43.  In an offering document dated February 20, 2015, the Aristone Defendants, on behalf of Rocky Aspen and Watershed, represented that the restaurant would be a "David Burke kitchen restaurant and lounge" "to be operated by David Burke Restaurant Group" and focused extensively on Burke's track record of

---

[6] Although Hanford's complaint alleges that the "Watershed Option" permits RAM 204 to take all three of these actions, the Watershed Option in fact only refers to the option to purchase additional economic and voting units. *Scottsdale Ins.*, 506 F. Supp. 3d at 220.  The removal of AH DB's voting rights was not optional but rather occurred automatically when AH DB failed to make its required contribution. *See id.*

success.  *Id.* ¶¶ 43–45.  No party mentioned to Hanford that Burke would no longer oversee the project or that he had resigned his position with Watershed.  *Id.* ¶ 47.  The financial projections provided for Rocky Aspen were based on Burke's association with the project.  *Id.*  The offering document stated that "membership interests for which subscriptions may be made have not been and will not be registered under the Securities Act of 1933 . . . and are being offered and sold in reliance on exemptions."  *Id.* ¶ 46.

Because Rocky Aspen did not have sufficient collateral and Castlegrace was willing to pledge its assets as security, Hanford decided to make the loan to Castlegrace.  *Id.* ¶ 41.  On April 30, 2015, Hanford loaned Castlegrace $700,000 to be used for the benefit of Rocky Aspen (the "Castlegrace Loan").  *Id.*

Defendants then approached Hanford for an additional $2.5 million loan.  *Id.* ¶ 50. McGrath told Hanford that this was the last infusion of money Rocky Aspen would need to get the restaurant up and running for the 2015 ski season.  *Id.* ¶ 51.  In July 2015, Hanford entered into a promissory note with Rocky Aspen as the borrower for a total loan amount of $3.2 million, with the Castlegrace Loan marked paid in full (the "Rocky Aspen Loan").  *Id.* ¶¶ 50, 52. McGrath and a co-manager signed the note on behalf of Rocky Aspen.  *Id.* ¶ 50.  McGrath also personally guaranteed payment of the loan.  *Id.* ¶ 53.

As part of the loan transaction, McGrath and his co-manager, as representatives of AH DB and RAM 204 respectively and as co-managers of Rocky Aspen, pledged their respective equity interests in Rocky Aspen as collateral for the loan.  *Id.* ¶ 58.  In the Pledge Agreement, they expressly represented that the collateral was free from all other liens and security interests and that the pledgors had power and authority to pledge the collateral.  *Id.* ¶ 59.  However, AH DB had already agreed to grant Watershed a security interest in its collateral pursuant to the

Watershed Option and indeed, "Watershed's right to exercise the Watershed Option . . . had already been triggered" by AH DB's failure to meet its funding commitments. *Id.* ¶ 62. The parties did not inform Hanford of the most recent amendment to the operating agreement. *Id.* ¶ 35. The parties also did not disclose that the Watershed and Aristone Defendants had signed between themselves a "binding term sheet" that same day which agreed that Watershed's right to exercise the Watershed Option had already been triggered and that the Aristone Defendants granted the Watershed Defendants "a security interest in their respective assets." *Id.* ¶ 62. Moreover, Defendants failed to disclose updated financial information for the project, instead relying on the financial projections at the time of the Castlegrace Loan. *Id.* ¶ 63. Hanford alleged that Watershed was purposefully waiting to exercise the Watershed Option until after the Rocky Aspen Loan had closed, because Watershed believed that if it did so the new shares issued to Watershed pursuant to the option would not be included in the collateral for the Rocky Aspen Loan. *Id.*

As part of the Rocky Aspen Loan transaction, McGrath and the other co-manager of Rocky Aspen provided Hanford with additional collateral in the form of a Leasehold Mortgage and Security Agreement on behalf of Rocky Aspen. *Id.* ¶ 64. In this agreement, Rocky Aspen warranted that it had the "power, authority, and legal right" to engage in the contemplated transaction and that the execution and delivery of the mortgage and carrying out of the transactions would not conflict with or breach the terms of any other agreement binding upon it. *Id.*

Upon the execution of the loan documents, in addition to marking the $700,000 Castlegrace Loan "paid in full," Hanford advanced $2 million pursuant to Rocky Aspen's instructions: $1,000,000 to a Rocky Aspen construction escrow account for payment to lien

claimants, $700,000 to Watershed, and $300,000 to Rocky Aspen, creditors of Rocky Aspen, and AH DB on behalf of Rocky Aspen. *Id.* ¶ 67. Rocky Aspen, via McGrath, then sought to draw an additional $500,000 from Hanford based on false representations that all liens encumbering the Premises had been released, construction was on track and on budget, and the collateral was not subject to any security interest. *Id.* ¶¶ 70, 72. Hanford relied on such representations and advanced the $500,000. *Id.* ¶ 73.

On December 31, 2015, Rocky Aspen finally opened the restaurant. *Id.* ¶ 74. On January 5, 2016, Watershed purportedly exercised the Watershed Option, becoming the owner of 95% of the equity and 100% of the voting rights in Rocky Aspen. *Id.* ¶¶ 75–76. In February 2016, Watershed threatened to place Rocky Aspen into bankruptcy if Hanford did not restructure the Rocky Aspen Loan. *Id.* ¶¶ 77–78. Hanford attempted to foreclose on the loan and take control of the collateral. *Id.* ¶¶ 85–89. Watershed then caused Rocky Aspen to file for protection under chapter 11 of the bankruptcy code on March 11, 2016. *Id.* ¶ 89.

Based on these allegations, Hanford claimed that McGrath sold unregistered securities and made fraudulent statements in the sale of securities beginning in February 2015, *id.* ¶¶ 159–218, failed to disclose material information pursuant to California Corporations Code §§ 25402 and 25502, *id.* ¶¶ 219–224, breached the Pledge Agreement by which AH DB and RAM 204 pledged their interests in Rocky Aspen, *id.* ¶¶ 225–237, fraudulently induced Hanford into lending money to Rocky Aspen, *id.* ¶¶ 238–259, negligently misrepresented information about Rocky Aspen, *id.* ¶¶ 260–271, tortiously interfered with Hanford's contract with Rocky Aspen, *id.* ¶¶ 272–280, engaged in unfair competition pursuant to the California Business and Professions Code, *id.* ¶¶ 281–287, breached a fiduciary duty to Hanford, *id.* ¶¶ 309–314, and breached a guaranty agreement, *id.* ¶¶ 315–319.

## 2.    Subsequent Developments in the Hanford Litigation

On November 9, 2016, "Craveable Hospitality Group" tendered the Hanford claims to Scottsdale for coverage using a form notice of claim. Dkt. No. 169-12. The "Agency" field of the notice named "Restaurant Programs of America" and included a stamp or sticker providing contact information for "Deb Delacruz, Claims Specialist." *Id.* The notice provided a phone number and address for the insured, referenced the policy number, and described the claims by stating "insured rec'd attached third party civil action . . securities fraud, violation of the exchange act full complaint attached." *Id.* Almost all of the other fields were left blank. *Id.*

On January 5, 2017, Scottsdale responded to Craveable Hospitality Group, which it described as "the authorized representative of Watershed," acknowledging receipt of "email correspondence from Restaurant Programs of America, dated November 9, 2016," containing a copy of the Hanford Complaint. Dkt. No. 169-13. It stated its preliminary coverage analysis that Watershed and several of its officers were Insureds, but RAM 204, McGrath, AH DB, Castlegrace, and Aristone were not Insureds. *Id.* at 3.[7] It appointed counsel to defend the Insureds. *Id.* at 5. McGrath was not aware of the Policy at this time. Dkt. No. 179 ¶ 41.[8]

On June 18, 2020, Hanford and Watershed reached a settlement in the Hanford Action by which Hanford agreed to dismiss its claims against Watershed and its affiliates with prejudice and to dismiss its claims against McGrath and his affiliated companies without prejudice. *Id.* ¶ 50. On July 15, 2020, the court dismissed the litigation over McGrath's objection. *Id.* ¶ 52.

---

[7] At some later time, Scottsdale changed position and decided that RAM 204 was an Insured under the Policy. *Id.* ¶ 46.

[8] On January 4, 2019, Hanford filed an Amended Answer, Counterclaims, and Third-Party Claims. Dkt. No. 169-5.

B.     **Rocky Aspen Bankruptcy Demand**

McGrath also seeks coverage for a demand made in connection with Rocky Aspen's

chapter 11 bankruptcy proceeding, which was filed on or about March 11, 2016, in the United

States Bankruptcy Court for the District of Colorado.  *See* Dkt. No. 14 ¶ 153; Dkt. No. 169-9

("Bankruptcy Petition"); *In re Rocky Aspen LLC*, Case No. 16-12194-EEB (Bankr. D. Colo.).

On or about April 18, 2016, the trustee in the Rocky Aspen bankruptcy (the "Trustee")

filed an adversary proceeding against Castlegrace seeking avoidance and recovery of fraudulent

transfer (the "Castlegrace Adversary Proceeding").  Dkt. No. 179 ¶ 32; *see* Dkt. No. 169-10.  The

complaint alleged that in April 2015, McGrath caused Castlegrace to execute a promissory note

for $700,000 in favor of Hanford, pledging as collateral Castlegrace's "apparent membership

interest" in AH DB.  *Id.* ¶¶ 14–16.  Then, on July 15, 2015, Rocky Aspen signed a promissory

note with Hanford funded in the approximate amount of $2,700,000, of which $700,000 was not

disbursed to Rocky Aspen but rather was used to repay the Castlegrace Loan, which was owed

by Castlegrace to Hanford.  *Id.* ¶¶ 22–24.  The complaint sought to recover the $700,000 transfer

from Castlegrace on the basis that it was not made to satisfy an antecedent debt of Rocky Aspen,

that Rocky Aspen did not receive reasonably equivalent value, and that at the time of the

payment, Rocky Aspen was already insolvent.  *Id.* ¶¶ 26–34.

On or about May 11, 2018, the Trustee filed an adversary proceeding against AH DB and

McGrath (the "McGrath Adversary Proceeding") for fraudulent transfer.  *Id.* ¶¶ 38–39; Dkt. No.

169-14.  The complaint alleged that on December 1, 2014, Watershed provided AH DB with the

Watershed Loan, which as noted above was in the amount of $700,000 and had a maturity date

of December 31, 2014.  Dkt. No. 169-14 ¶ 16.  McGrath personally guaranteed the loan.  *Id.* ¶

17.  AH DB and McGrath then defaulted on their obligations with regard to the loan.  On July

31, 2015, Rocky Aspen obtained a loan from Hanford for $3.2 million, of which $700,000 was

14

advanced to Watershed to repay the Watershed Loan. *Id.* ¶¶ 19–20. Only AH DB and McGrath were liable for the Watershed Loan, and Rocky Aspen did not receive reasonably equivalent value for transferring the money for their benefit. *Id.* ¶¶ 21–32. The Trustee therefore sought to avoid the transfer and recover its value from AH DB and McGrath. *Id.*

McGrath became aware of the Policy on November 14, 2018, during a settlement conference in the Hanford Litigation. Dkt. No. 179 ¶ 41. He received a copy of the Policy the next day. *Id.* ¶ 42.

On or about June 7, 2019, counsel for the Trustee sent a letter to McGrath's counsel and another lawyer demanding a certain sum to resolve both the Castlegrace Adversary Proceeding and the McGrath Adversary Proceeding (the "Demand"). Dkt. No. 169-16. The same day, McGrath's counsel tendered the Demand to Scottsdale under the Policy on behalf of McGrath and AH DB. Dkt. No. 169-15. On June 10, 2019, Scottsdale responded acknowledging receipt of tender and stating "[p]lease advise how you believe Patrick McGrath or AHDB Kitchen are insureds under the Watershed Policy." *Id.* After McGrath's counsel responded with his position, Scottsdale denied coverage for the Demand on July 15, 2019. Dkt. No. 169-18.

## PROCEDURAL HISTORY

On August 9, 2019, Scottsdale filed this action seeking a declaratory judgment against McGrath, AH DB, and Castlegrace that McGrath's claim for the bankruptcy Demand and adversary proceedings is not covered under the Policy. Dkt. No. 1. Count I of Scottsdale's complaint seeks a declaratory judgment that Defendants are not Insureds under the Policy. Dkt. No. 1 ¶¶ 30–32. Count II seeks a declaratory judgment that the claim does not allege Wrongful Acts because all of the wrongdoing alleged in the claim took place prior to January 6, 2016. *Id.* ¶¶ 33–35. Count III seeks a declaratory judgment that the Subsidiary Exclusion of the Policy precludes coverage of the claim. *Id.* ¶¶ 36–38. Count IV seeks a declaratory judgment that

Defendants did not provide Scottsdale with timely notice of the claim as required by the Policy. *Id.* ¶¶ 39–41.

On October 22, 2019, McGrath, AH DB, and Castlegrace answered the complaint, and McGrath filed counterclaims against Scottsdale. Dkt. No. 14.[9] In his first counterclaim, McGrath seeks a declaratory judgment that he is an Insured under the Policy. *Id.* ¶¶ 125–137. McGrath's second counterclaim asserts a claim for bad faith breach of insurance contract, *id.* ¶¶ 138–147, and his third counterclaim asserts a claim for breach of the duty to defend, *id.* ¶¶ 148–158. McGrath claims that Scottsdale had a duty to defend him both in connection with the Demand in the bankruptcy proceeding and in connection with the Hanford Litigation. *Id.*

On June 22, 2020, Scottsdale moved, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment on Counts I–III of its complaint. Dkt. No. 36. The Court issued an Opinion and Order on December 11, 2020, denying Scottsdale's motion. Dkt. No. 53. Scottsdale's motion presented a single question: whether Rocky Aspen was a Subsidiary of Watershed as defined in the Policy during the time McGrath served as co-manager. The Court concluded that Rocky Aspen became a Subsidiary of Watershed on March 25, 2015, when, pursuant to the agreement between AH DB and RAM 204, AH DB forfeited all of its Voting Units in Rocky Aspen and when, as a result, Watershed, through RAM 204, alone had the sole right to appoint, remove, and replace co-managers of the joint venture. *Id.* at 13–14.

On April 15, 2021, Scottsdale moved for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, seeking dismissal of McGrath's second counterclaim for bad faith

---

[9] McGrath also asserted third-party claims against Watershed for aiding and abetting breach of the duty to defend, *id.* ¶¶ 159–163, fraudulent concealment, *id.* ¶¶ 164–170, and failure to disclose material information, *id.* ¶¶ 171–177, and a counterclaim and third-party claim for an equitable lien, *id.* ¶¶ 178–182. Watershed was never served in this case and was voluntarily dismissed on February 9, 2024. Dkt. No. 104.

and the prayer in the counterclaim for consequential and punitive damages. Dkt. No. 62. The Court granted that motion in its entirety in an Opinion and Order dated July 19, 2021. Dkt. No. 72. The Court concluded that McGrath had not identified facts that would support a claim for bad faith liability. *Id.* at 13. The Court also struck the prayer for relief seeking consequential and punitive damages. *Id.* at 19–31. As a result, McGrath was left with only a single counterclaim for breach of the duty to defend, with damages within the policy limit.

After the Court rendered its two summary judgment decisions, the parties entered into a Stipulated Conditional Final Judgment ("SCJ"), which was intended to expedite consideration of the Court's two summary judgment decisions by the United States Court of Appeals for the Second Circuit. *See* Dkt. No. 80. The parties recognized that the Court's first summary judgment order had determined that McGrath was an Insured as co-manager of Rocky Aspen from May 25, 2015, to January 5, 2016, and that the second summary judgment order had dismissed McGrath's claims for bad faith breach of contract and prayers for consequential and punitive damages. *Id.* ¶ 3. The parties further agreed that the amount of damages awarded to McGrath on his counterclaim for breach of the duty to defend was the $1 million limit of liability under the policy, but the SCJ further provided that if either the first or second summary judgment order were reversed, reversed in part, or vacated and remanded, in whole or in part, that the terms of the SCJ would no longer be binding. *Id.* ¶ 7.

Before oral argument, the Second Circuit raised questions about whether the SCJ was a final judgment providing it with jurisdiction to decide the case and directed the submission of letter briefs. On December 11, 2023, the Second Circuit dismissed the appeal for lack of jurisdiction. *See Scottsdale Ins. Co. v. McGrath*, 88 F.4th 369 (2d Cir. 2023). It held that the SCJ was not a final judgment because this Court "never ruled on the pivotal question whether

Scottsdale had a contractual duty, and breached that duty, to defend McGrath," noting that while the Court "ruled that McGrath is an Insured under the Policy (resolving Count One of Scottsdale's Complaint),[10] that ruling did not end the duty-to-defend inquiry because, in Counts Two through Four of its complaint, Scottsdale advanced several additional arguments disputing its duty to defend" including that "the underlying claims against McGrath do not allege a Wrongful Act within the meaning of the Policy (Count Two); the Policy's Subsidiary Exclusion applies (Count Three); and Defendants failed to provide Scottsdale with timely notice of the claim (Count Four)." *Id.* at 381. The Second Circuit noted that it also was "clear that the district court did not resolve Count Four," because it "never addressed whether Defendants provided Scottsdale with timely notice of the claim." *Id.* at 381 n.11.

The parties submitted motions in limine on September 30, 2024. Dkt. Nos. 132, 137. By Memorandum and Order dated October 7, 2024, the Court granted Scottsdale's motion to strike Sections A and B of McGrath's motions in limine with the exception of Section A(d). Dkt. No. 151. Each party submitted a response to the opposing party's motions in limine, and Scottsdale submitted a supplemental response as ordered by the Court to Sections A(d) and E of McGrath's motions. Dkt. Nos. 156–157, 162.

The Court issued an Opinion and Order on the motions in limine on October 17, 2024. Dkt. No. 164. The Court held that statements made by Scottsdale's counsel to the Second Circuit did not constitute judicial admissions and were inadmissible at trial. *Id.* at 9–14. It also held that damages related to the lawsuit filed by Hanford in state court were consequential damages and therefore could not be recovered. *Id.* at 14–15.

---

[10] The Court's ruling in fact resolved Count I of Scottsdale's complaint only as to McGrath. *See Scottsdale Ins.*, 506 F. Supp. 3d at 218. The Court did not hold that AH DB or Castlegrace were Insureds under the Policy.

At the final pretrial conference on October 24, 2024, the trial was adjourned sine die and the parties agreed to an additional round of summary judgment briefing.  *See* Dkt. No. 167.

On November 15, 2024, Scottsdale filed a motion for summary judgment supported by an affidavit of counsel, twenty exhibits, a Local Rule 56.1 statement, a memorandum of law, and a request for judicial notice.  Dkt. Nos. 169–171.[11]  On December 6, 2024, McGrath moved for leave to file excess pages in his opposition and cross-motion.  Dkt. No. 174.[12]  On December 7, 2024, McGrath filed a memorandum of law in support of his motion for summary judgment and in opposition to Scottsdale's motion for summary judgment.  Dkt. No. 175.[13]  McGrath also filed an affidavit of counsel, eighteen exhibits, a counterstatement to Scottsdale's Rule 56.1 statement, and his own Rule 56.1 statement.  Dkt. Nos. 176–178.  On January 7, 2025, the parties filed a joint Rule 56.1 statement.  Dkt. No. 179.  On January 7, 2025, Scottsdale filed a reply memorandum of law in support of its own motion for summary judgment and in opposition to McGrath's motion for summary judgment.  Dkt. No. 180.  On January 21, 2025, McGrath filed a reply memorandum in further support of his motion for summary judgment.  Dkt. No. 181.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[11] The motion for judicial notice asks the Court to take judicial notice of documents filed in related court proceedings.  Dkt. No. 171.  "[C]ourts routinely take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991).  The motion is granted.

[12] The motion to file excess pages seeks to reallocate pages from McGrath's reply to his brief in support/opposition.  *See* Dkt. No. 175.  Scottsdale does not oppose the motion, and the motion is granted.

[13] Neither McGrath nor Scottsdale filed a notice of motion as required by Local Civil Rule 7.1.  However, it is clear from context that each party is moving for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all claims.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the

motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal

citation omitted).  "Mere conjecture or surmise by the nonmovant in support of his or her case is

inadequate." *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

Local Rule 56.1 of the Local Rules for the Southern District prescribes the manner and

method in which a party is to present undisputed issues of fact to the Court.  The moving party

must annex to its notice of motion "a separate, short and concise statement, in numbered

paragraphs, of the material facts as to which the moving party contends there is no genuine issue

to be tried."  Local Rule 56.1(a).  The party opposing the motion for summary judgment is

required to "include a correspondingly numbered paragraph admitting or denying, or otherwise

responding to, each numbered paragraph in the statement of the moving party."  Local Rule

56.1(b).  Each statement "must be followed by citation to evidence that would be admissible and

set forth as required by Fed. R. Civ. P. 56(c)."  Local Rule 56.1(d).  The consequences of failure

to follow these rules can be severe.  "Each numbered paragraph in the statement of material facts

set forth in the statement required to be served by the moving party will be deemed to be

admitted for purposes of the motion unless specifically denied and controverted by a

correspondingly numbered paragraph in the statement required to be served by the opposing

party."  Local Rule 56.1(c).

Thus, a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are

otherwise unsupported in the record."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.

2001).  If portions of a Rule 56.1 counterstatement cite to no admissible evidence in support of

its denials, the Court is instructed to disregard those portions and deem the factual statements in

the original Rule 56.1 statement admitted.  *See, e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous.*

*Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not

21

supported by citations to admissible record evidence are to be disregarded).  When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its 56.1 statement as undisputed. *See Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C. Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

## DISCUSSION

Scottsdale argues that the underlying actions do not allege a Wrongful Act within the meaning of the Policy, that coverage is barred by the Subsidiary Exclusion of the Policy, that McGrath failed to provide adequate Notice under the Policy, that breach of the Warranty and Application condition in the Policy bars coverage, that the underlying actions do not allege a Loss within the meaning of the Policy, and that fees incurred without Scottsdale's consent are not covered.  Dkt. Nos. 169, 180.  McGrath argues that the underlying actions do allege acts which are covered under the Policy, that the Notice condition was satisfied or waived, that arguments related to breach of warranty were waived, and that McGrath is entitled to recover up to the $4 million face value of the Policy.  Dkt. Nos. 174, 181.

All claims and counterclaims here involve Scottsdale's duty to defend under the Policy. "An insurance agreement is subject to principles of contract interpretation."  *Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 37 N.E.3d 78, 80 (N.Y. 2015)).  "As with the construction of contracts generally, 'unambiguous provisions of an insurance contract must be given their

plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.'" *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044, 1047 (N.Y. 2008) (quoting *White v. Continental Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)).  "[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (quotations omitted).  "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Id.* at 748.  "In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Id.* (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996)).

"In New York, an insurer's duty to defend is 'exceedingly broad.'" *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (quoting *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006)).  If there is a "reasonable possibility of coverage," the insurer "will be called upon to provide a defense." *Id.* at 141 (quoting *Auto. Ins. Co. of Hartford*, 850 N.E. 2d at 1155); *see also Atl. Mut. Ins. Co. v. Terk Techs. Corp.*, 763 N.Y.S.2d 56, 61 (1st Dep't 2003) ("An insurer's duty to defend is triggered whenever allegations set forth in a complaint state a cause of action that gives rise to a reasonable possibility of recovery under the policy.").  "[A] defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Century 21, Inc. v. Diamond State Ins. Co.*, 442 F.3d 79, 82–83 (2d Cir. 2006) (quoting *Servidone Constr. Corp. v. Security Ins. Co. of Hartford*, 477 N.E.2d 441, 442 (N.Y. 1985)).  "If any of the claims against the insured arguably arise from covered events, the insurer

is required to defend the entire action." *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 95 (2d Cir. 2018) (quoting *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 690 N.E.2d 866, 869 (N.Y. 1997)).  However, "unsubstantiated speculation" and "conjecture" are not sufficient to trigger a duty to defend.  *RSUI Indem. Co. v. RCG Grp. (USA)*, 890 F. Supp. 2d 315, 331 (S.D.N.Y. 2012), *aff'd*, 539 F. App'x 3 (2d Cir. 2013) (citations omitted); *see also Stamford Wallpaper Co. v. TIG Ins.*, 138 F.3d 75, 81 (2d Cir. 1998) ("[W]e will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them.").

"New York courts look to two sources of information to determine whether there is a possible factual or legal basis for an obligation to defend." *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 323 (S.D.N.Y. 2020).  First, under the "four corners" rule, "[a]n insurer's duty to defend 'arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim.'" *Worth Const. Co. v. Admiral Ins. Co.*, 888 N.E.2d 1043, 1045 (N.Y. 2008) (quoting *Frontier Insulation Contractors*, 690 N.E.2d at 868 (N.Y. 1997)).  "Those allegations must be 'liberally construed' and '[a]ny doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier.'" *Charter Oak Fire*, 462 F. Supp. 3d at 324 (quoting *Euchner-USA*, 754 F.3d at 141).  Second, even if the complaint itself does not reveal the possibility of coverage, "the insurer is required 'to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage.'" *Id.* (quoting *Fitzpatrick v. Am. Honda Co.*, 575 N.E.2d 90, 93 (N.Y. 1991)).  In analyzing whether the facts and allegations potentially give rise to a covered claim, any exclusions from coverage "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow

construction." *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co*., 908 N.E.2d 875, 877 (N.Y. 2009) (quoting *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984))

Under this standard, Scottsdale has no duty to defend either of the Claims for which McGrath seeks coverage.

## I.    The Hanford Complaint

The Hanford Complaint alleges that McGrath defrauded Hanford in connection with loans to and investments in Rocky Aspen both before and after Rocky Aspen became a Subsidiary of Watershed. *See* Dkt. No. 169-4. Scottsdale argues primarily that the acts alleged are not Wrongful Acts, that coverage is barred by the Subsidiary Exclusion, and that McGrath failed to provide adequate Notice under the Policy. Dkt. Nos. 169, 180. Although Scottsdale's other arguments are unavailing, coverage for the Hanford Complaint is barred by the broad Subsidiary Exclusion in the Policy, which excludes coverage for Claims "in any way involving any Wrongful Act actually or allegedly committed or attempted by a Subsidiary or Directors and Officers thereof . . . before the date such entity became a Subsidiary." Policy D&O Coverage Section C.1.h.

### A.    Wrongful Acts

The Court first turns to the disputed issue of whether the Hanford Complaint alleges Wrongful Acts at all, which is necessarily preliminary to the application of the Subsidiary Exclusion. On this issue, McGrath has the better of the argument.

"Wrongful Act" is defined in the Policy as "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any Director or Officer solely by reason of his or her serving in such capacity." Dkt. No. 179 ¶ 23; *see* Policy D&O Coverage Section B.9. Scottsdale argues that the

claims against McGrath in the Hanford Complaint do not constitute Wrongful Acts because they sound in breach of contract.  Dkt. No. 169 at 13–18.

However, the Hanford Complaint makes a number of allegations against McGrath that fall within the Policy's definition of Wrongful Act.  The Policy explicitly names "omission[s]," "misleading statement[s]" and "misstatement[s]" as examples of Wrongful Acts.  Policy D&O Coverage Section B.9.  The Complaint is centered on false or misleading statements made by McGrath and others to induce Hanford to loan money to Rocky Aspen.  *See* Dkt. No. 169.  For example, McGrath represented that equity interests in Rocky Aspen were free and clear of all liens and security interests, which was not true.  *Id.* ¶¶ 59–62.  McGrath or companies he controlled provided Hanford with an offering document describing the planned restaurant as a David Burke restaurant, although it was then known that Burke would be minimally involved. *Id.* ¶¶ 43, 239.  Based on such statements, the Hanford Complaint makes claims against McGrath for fraud, negligent misrepresentation, and securities fraud.  *Id.* ¶¶ 159–218, 238–259, 260–271. The Hanford Complaint also squarely alleges that the statements were made by McGrath "while acting in [his] capacity" as an officer or director of Rocky Aspen.  Policy D&O Coverage Section B.9.  The Complaint states that the misstatements regarding the Castlegrace Loan were made "on behalf of Rocky Aspen," *id.* ¶ 43, and that McGrath agreed to pledge securities and provide a mortgage on Rocky Aspen's property "as co-manager[] of Rocky Aspen."  *Id.* ¶¶ 58, 64.  In addition to the misstatements, Hanford alleges that McGrath breached a fiduciary duty towards Hanford as owner of Rocky Aspen securities by mismanaging Rocky Aspen and its assets, which would constitute a "breach of duty" by McGrath while acting as an officer of Rocky Aspen.  *Id.* ¶¶ 311–312.  It is clear that many of Hanford's claims at least "arguably arise

from" McGrath's Wrongful Acts. *High Point Design*, 911 F.3d at 95 (quoting *Frontier Insulation Contractors*, 690 N.E.2d at 869).

Scottsdale argues that "courts have held that a claim alleging breach of contract is not covered under a professional liability policy because there is no 'wrongful act' and no 'loss' since the insured is simply being required to pay an amount it agreed to pay." Dkt. No. 169 at 17 (quoting 23 Appleman on Insurance 2d (Holmes ed. 2003) § 146.6[I], at 120–21; *see Women's Integrated Network, Inc. v. U.S. Specialty Ins. Co.*, 2012 WL 13070116, at *8 (S.D.N.Y. Oct. 26, 2012). But Scottsdale's contention that "McGrath is simply being asked to pay an amount he agreed to pay" grossly misstates the allegations of the Hanford Complaint. Dkt. No. 169 at 4. It is true that Hanford brought a claim against McGrath on a personal guaranty associated with the Rocky Aspen Loan. Dkt. No. 169-4 ¶¶ 52, 315–319. However, Hanford also brought numerous claims against McGrath for fraud, negligent misrepresentation, failure to disclose, tortious interference, and breach of fiduciary duty. *See id.* ¶¶ 159–224, 238–314. These claims relate to false statements or omissions in connection with the Rocky Aspen Loan and Castlegrace Loan, neither of which were contracts between Hanford and McGrath. "If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." *High Point Design*, 911 F.3d at 95 (quoting *Frontier Insulation Contractors, Inc.*, 690 N.E.2d at 869). It is therefore immaterial that some of Hanford's claims against McGrath sound in breach of contract, so long as at least one of Hanford's claims alleges Wrongful Acts.[14] *See CGS Indus.,*

---

[14] Perhaps recognizing this issue, Scottsdale contends on reply that "[a]ll counts in the Hanford Third Party Claims are inextricably intertwined with the Hanford Loan as to be inseparable from the breach of contract claims." Dkt. No. 180 at 3; *see also* Dkt. No. 169 at 14. But a fraud claim is separable from a breach of contract claim when the misrepresentations are "collateral" to the contract, including "misrepresentation of a material fact which is inducement for the contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). This principle clearly applies here, when the alleged misrepresentations regarding Rocky Aspen's business plans and the status of

*Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013) ("[W]here several claims arise from the same set of facts, if any of the claims are covered by the policy, the insurer 'consequently has a duty to defend the entire action brought under any of the . . . policies,' including the uncovered claims." (quoting *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 779 N.E.2d 167, 172 (N.Y. 2002)).  This requirement is satisfied.

## B.    Subsidiary Exclusion

Scottsdale next argues that, assuming the Hanford Complaint does describe Wrongful Acts, coverage is nonetheless barred by the Subsidiary Exclusion because such acts either occurred before Rocky Aspen became a Subsidiary or are intertwined with Acts that occurred before Rocky Aspen became a Subsidiary.  Dkt. No. 169 at 20–22.  This argument has merit. The Subsidiary Exclusion provides that Scottsdale will not cover Claims, like Hanford's, that involve Wrongful Acts occurring both before and after Rocky Aspen became a Subsidiary.

The Subsidiary Exclusion of the Policy excludes coverage for:

Loss . . . on account of any Claim . . .

[A]gainst any of the Directors and Officers of any Subsidiary or against any Subsidiary alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed or attempted by a Subsidiary or Directors and Officers thereof:

i. before the date such entity became a Subsidiary or after the date such entity ceased to be a Subsidiary; or

ii. occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring before the date such entity became a Subsidiary, would constitute Interrelated Wrongful Acts.

---

the security interest are alleged to have been made as inducement for the Hanford loans.  Dkt. No. 169-4 ¶¶ 47–48, 62–63.  The claims against McGrath for securities law violations and breach of fiduciary duty also allege separate theories of recovery and damages from Hanford's breach of contract claims.

Policy D&O Coverage Section C.1.h.  Interrelated Wrongful Acts "means all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes."  Policy D&O Coverage Section B.6.

The plain language of the Subsidiary Exclusion relieves Scottsdale of the duty to defend McGrath for the Hanford Complaint.  The Exclusion applies to Loss "on account of any Claim" that fits within the provision.  Policy D&O Coverage Section C.1.h.  "Claim" is defined as, among other things, "a written demand . . . for monetary damages or non-monetary or injunctive relief" or "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading."  Dkt. No. 179 ¶ 22; *see* Policy D&O Coverage Section B.1.  It is not defined as a cause of action but as the proceeding as a whole.  This usage is consistent throughout the Policy.  *See* Policy D&O Coverage Section F (discussing the defense and settlement of Claims); Policy at 22 (discussing allocation when a Claim "includes both covered and uncovered matters").[15]

When Claim is defined in this manner, the Court must analyze whether the exclusion is applicable to the proceeding or demand "as a whole," rather than conducting analysis "on an allegation-by-allegation or cause-of-action-by-cause-of-action basis."  *Daileader v. Certain Underwriters at Lloyd's London - Syndicate 1861*, 670 F. Supp. 3d 12, 42 (S.D.N.Y. 2023), *aff'd*

---

[15] The Policy's discussion of retentions states that "[i]f different parts of a single Claim are subject to different applicable Retentions . . . the applicable Retentions will be applied separately to each part of such Loss, but the sum of such Retentions shall not exceed the largest applicable Retention."  Policy D&O Coverage Section D.1.  This shows that when the Policy sought to parse out "parts of a . . . Claim," it did so explicitly.  *See Joy Constr. Corp. v. Starstone Specialty Ins. Co*., 2025 WL 1677805, at *6 (S.D.N.Y. June 13, 2025) (noting that use of term "portion of a Claim" elsewhere in the Policy, but not in exclusion, suggested that exclusion was intended to apply to entire Claim).

*sub nom. Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 2023 WL 7648381 (2d Cir. Nov. 15, 2023), *and aff'd sub nom. Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351 (2d Cir. 2024); *see XL Specialty Ins. Co. v. Agoglia*, 2009 WL 1227485, at *8 (S.D.N.Y. Apr. 30, 2009), *on reconsideration sub nom. Murphy v. Allied World Assur. Co.*, 2009 WL 1528527 (S.D.N.Y. May 29, 2009), *and aff'd sub nom. Murphy v. Allied World Assur. Co. (U.S.)*, 370 F. App'x 193 (2d Cir. 2010); *Joy Constr. Corp. v. Starstone Specialty Ins. Co.*, 2025 WL 1677805, at *5 (S.D.N.Y. June 13, 2025); *Paraco Gas Corp. v. Ironshore Indem., Inc.*, 2023 WL 4134661, at *5–6 (S.D.N.Y. June 22, 2023), *aff'd*, 2024 WL 3024658 (2d Cir. June 17, 2024).  Any other interpretation would fail to give effect to the "plain contractual language." *Daileader*, 96 F.4th at 360; *see Bear Stearns*, 884 N.E.2d at 1047 ("[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning." (quoting *White*, 878 N.E.2d at 1021)).[16]  Either the entire Claim is excluded or it is not.

   The Claim is excluded if it is "based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed" by the Subsidiary or its officers before the date the entity became a

---

[16] In *Westpoint Int'l, Inc. v. Am. Int'l S. Ins. Co.*, the First Department suggested that despite a policy defining "Claim" to mean lawsuit, the application of an exclusion to a "Claim" should be based on each cause of action rather than the complaint as a whole.  899 N.Y.S.2d 8, 9 (1st Dep't 2010).  However, the Second Circuit declined to follow this holding in *Daileader*, seemingly limiting it to the narrow text of the exclusion at issue in *Westpoint*.  *See Daileader*, 96 F.4th at 360 ("[T]he exclusion in *Westpoint* was not so sweeping as the one at issue here: it did not extend to claims 'in any way involving . . . in whole or in part' the conduct in question.").  The exclusion here contains broader "in any way involving" language similar to the exclusion at issue in *Daileader*.  *See* Policy D&O Coverage Section C.1.h.  Moreover, while technically distinguishing *Westpoint*, the Second Circuit's reasoning in *Daileader* casts significant doubt on whether that case accurately reflects New York law.  *See Paraco Gas*, 2023 WL 4134661, at *6 (noting that *Westpoint* "did not cite any authority" and may not be regarded as persuasive).

subsidiary.  Policy D&O Coverage Section C.1.h.  The first set of phrases in this provision set

out a causal exclusion.  The phrase "arising out of" means "originating from, incident to, or

having connection with."  *Maroney v. New York Cent. Mut. Fire Ins. Co*., 839 N.E.2d 886, 889

(N.Y. 2005); *see also Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd*., 668 N.E.2d 404, 406

(N.Y. 1996) ("There is no significant difference between the meaning of the phrases 'based on'

and 'arising out of' in the coverage or exclusion clauses of an insurance policy.").  An "arising

out of" exclusion "requires only that there be some causal relationship between the injury and the

risk for which coverage is provided," akin to but-for causation rather than proximate cause.

*Maroney*, 839 N.E.2d at 889; *see Burlington Ins. Co. v. NYC Transit Auth*., 79 N.E.3d 477, 483

(N.Y. 2017) (distinguishing "arising out of" from language denoting proximate cause).

　　　　Although but-for causation is already a broad standard, it is further broadened here by the

language "caused directly or indirectly" and "in any way involving."  "Courts have interpreted

'caused directly or indirectly' to mean 'contributed to,' not 'caused exclusively' or 'a but-for

cause of.'"  *Daileader*, 670 F. Supp. 3d at 45; *see 7001 E. 71st St., LLC v. Cont'l Cas. Co*., 739

F. App'x 37, 39–40 (2d Cir. 2018) (summary order).  Courts have interpreted "in any way

involving" not to require causation at all; it is satisfied by a mere showing that the same

underlying facts or allegations are "involved" in multiple claims.  *See Quanta Lines Ins. Co. v.

Invs. Cap. Corp*., 2009 WL 4884096, at *21 (S.D.N.Y. Dec. 17, 2009) (rejecting argument that

"in any way involving" required causation), *aff'd sub nom. Quanta Specialty Lines Ins. Co. v.

Invs. Cap. Corp*., 403 F. App'x 530 (2d Cir. 2010); *Darwin Nat. Assur. Co. v. Westport Ins.

Corp*., 2015 WL 1475887, at *13 (E.D.N.Y. Mar. 31, 2015) (holding that "in any way involving"

simply requires "some sort of connection or relationship"); *see also Hamilton Specialty Ins. Co.,

Inc. v. Kinsale Ins. Co*., 613 F. Supp. 3d 735, 740 (S.D.N.Y. 2020) ("This term dictates that the

exclusion be read broadly."); *Daileader*, 96 F.4th at 360 (describing the language as "sweeping").

Here, it is clear that the Hanford Complaint "arises out of" or "in any way involves" Wrongful Acts allegedly committed by Rocky Aspen and McGrath prior to Rocky Aspen becoming a Subsidiary. The Hanford Complaint alleges that in February 2015, prior to Rocky Aspen becoming a Subsidiary within the meaning of the policy, McGrath and companies he controlled issued an offering document which made misrepresentations regarding Rocky Aspen's business prospects. Dkt. No. 169-4 ¶¶ 43–45, 47. Specifically, the offering document represented that Rocky Aspen was a David Burke project with rosy financial prospects. *Id.* ¶¶ 43–45.[17] These misrepresentations allegedly induced Hanford to make the Castlegrace Loan in April 2015. *Id.* ¶ 48. In addition, Hanford relied on the same financial projections at the time of the Rocky Aspen Loan and subsequent draw request. *Id.* ¶¶ 63, 72. These misrepresentations about Rocky Aspen's "operations" and "current and future financial prospects," along with misrepresentations regarding Rocky Aspen's securities and operating agreement, "result[ed] in Hanford agreeing to make loans totaling $3.2 million and accepting the Pledged Collateral as collateral for the Rocky Aspen Loan based on a misplaced belief that the Pledged Collateral was worth millions." *Id.* ¶¶ 115–116; *see id.* ¶ 161.

These allegations show that McGrath's alleged Wrongful Act of misrepresenting Rocky Aspen's business prospects in February 2015 was a but-for cause of Hanford's Claim. The February 2015 offering document representing that Rocky Aspen was a valuable investment

---

[17] The offering document additionally stated that Rocky Aspen securities were properly being offered and sold in reliance on exemptions from the Securities Act, which is material to Hanford's later claims for unregistered sale of securities in connection with the Rocky Aspen Loan. *Id.* ¶ 46.

prospect was the foundation of the relationship between Hanford and Rocky Aspen. If Hanford had not been led to believe that Rocky Aspen was a desirable investment prospect, it would not have provided the Castlegrace Loan. *Id.* ¶ 48. If Hanford had not provided the Castlegrace Loan and had accurately understood Rocky Aspen's business prospects, there would have been no reason for it to further lend $3.2 million secured by Rocky Aspen's securities. Even assuming the securities were unencumbered, they would not have been accepted as collateral absent Hanford's belief that they had value. This was an assumption based on the financial projections and Rocky Aspen's purported status as a David Burke restaurant, as described in the February 2015 offering document. *See id.* ¶¶ 147–148 (noting that the securities decreased in value when financial projections were revised to account for Burke's absence, and that the current value of the securities is between 0 and $10,000). If the February 2015 document had not described Rocky Aspen as a valuable investment, there would have been no reason for Hanford to engage in any of the further transactions underlying its Claim.

The alleged misrepresentations in the February 2015 offering document also caused Hanford's Claim "directly or indirectly" and were "in any way involved" in the Claim. Hanford's Claim is rooted in the Rocky Aspen Loan. Hanford's decision to make the Rocky Aspen Loan was partially caused by misrepresentations of the status of Rocky Aspen's securities after Rocky Aspen became a Subsidiary. *Id.* ¶ 62. But the February 2015 offering document also "contributed to," or was "involved" in the decision to make the Loan, because Hanford relied on the projections in that document when making the Loan. *Daileader*, 670 F. Supp. 3d at 45; *see* Dkt. No. 169-4 ¶¶ 63, 115–116. Hanford makes clear that its losses on Rocky Aspen securities stemmed from misrepresentations "[b]eginning in February 2015." Dkt. No. 169-4 ¶ 161. The February 2015 offering document is not merely background context, but is a Wrongful

Act for which the Hanford Complaint seeks to hold McGrath and Rocky Aspen liable. *See id.* ¶¶ 161, 194, 211, 216. It is involved in Hanford's Claim. Therefore, any loss from the Claim is excluded from coverage under the Policy, and Scottsdale has no duty to defend.

McGrath argues that the duty to defend applies unless the allegations "cast that pleading solely and entirely within the policy exclusions," and "are subject to no other interpretation." Dkt. No. 175 at 25 (quoting *Allstate Ins. Co. v. Mugavero*, 589 N.E.2d 365 (N.Y. 1992)); Dkt. No. 181 at 6. The force of this argument is that because some of the allegations occurred after Rocky Aspen became a subsidiary and would give rise to a covered loss, the duty to defend is triggered. Even if it is possible McGrath's Loss could arise out of uncovered events, it is also possible Loss could arise out of covered events, and until the latter possibility is excluded the insurer must defend the Claim.

Although this reasoning tracks otherwise applicable law regarding the duty to defend, it is overridden here by the language of the Policy. *See Daileader*, 96 F.4th at 360 ("This plain contractual language defeats Daileader's invocation of general New York contract principles."); *Joy Constr.*, 2025 WL 1677805, at *8 ("[T]he Policy's definition of 'Claim' to encompass the entirety of the EEOC proceeding and the Exclusion's use of exceedingly broad language . . . overcomes New York insurance law's default rules."); *Daileader*, 670 F. Supp. 3d. at 44 ("[T]he New York state cases cited by Daileader for the proposition that an insurer must defend an entire action in which any allegation in the complaint is covered do not apply here, because of the Policy's definition of 'claim' and the Policy's allocation clause."). The Policy defines "Claim" as an entire demand or proceeding. It then excludes any Claim "in any way involving any Wrongful Act actually *or allegedly* committed or attempted" by a Subsidiary or its Officers or Directors before it became a Subsidiary. Policy D&O Coverage Section C.1.h.

Therefore, if a proceeding or demand involves a Wrongful Act allegedly committed before the Subsidiary became a Subsidiary, the proceeding or demand is "solely and entirely within" the Exclusion and "subject to no other interpretation." *Allstate Ins.*, 589 N.E.2d at 368.  It is immaterial whether the liability eventually established is only for Wrongful Acts occurring after the Subsidiary became a Subsidiary.  This will not change the fact that the Claim involved Wrongful Acts allegedly committed before the Subsidiary became a Subsidiary.  The bargain struck by the Policy is that such Claims will be excluded from coverage regardless of the eventual result of the proceeding.[18]

McGrath additionally argues that transmitting the February 2015 offering document was not a Wrongful Act and in any case was not committed by McGrath in his capacity as a Director or Officer of Rocky Aspen.  Dkt. No. 175 at 13–29.  However, this argument is contrary to the allegations of the Hanford Complaint.  Because the exclusion covers any "Wrongful Act actually or allegedly committed or attempted by a Subsidiary or Directors and Officers thereof," Scottsdale need not prove that transmitting the offering document was in fact a Wrongful Act or in fact committed by McGrath—it need only show that this was alleged.  Policy D&O Coverage Section C.1.h.  Hanford alleges that transmitting the document was a Wrongful Act occurring in February 2015, stating that the representations in it were "materially false and misleading when

---

[18] Although this broad definition of "Claim" is unfavorable to the insured in the context of excluded "Claims," the term "Claim" is used in the Policy's Insuring Clause and other provisions where a broad definition of the term might expand coverage.  *See* Policy D&O Coverage Sections A.1, D.3.  For example, Section D.3 of the Policy states that if a Claim made after the Policy Period arises out of the same Wrongful Act as a Claim made during the Policy Period, the two are deemed to be a single Claim made during the Policy Period.  Policy D&O Coverage Sections D.3.  Because of the broad definition of Claim, it would appear that so long as a Claim made after the Policy Period, "as a whole," arose out of the same Wrongful Acts as a Claim made during the Policy Period, the entire Claim would be deemed to have been made within the Policy Period, even as to causes of action which "could be said to arise out of [] entirely separate" Wrongful Acts.  *Agoglia*, 2009 WL 1227485, at *9.

made." Dkt. No. 169-4 ¶ 47; *see id.* ¶ 95. Wrongful Acts specifically include "misleading statement[s]." Policy D&O Coverage Section B.9. The Hanford Complaint also expressly alleges that the offering document was circulated by "the Aristone Defendants, on behalf of Rocky Aspen and the Watershed Defendants," and that it made misrepresentations "on behalf of Rocky Aspen." *Id.* ¶ 43; *see also id.* ¶ 45 ("The offering document was circulated on behalf of Rocky Aspen and each Defendant."); *id.* ¶ 95 (describing "Rocky Aspen's representations" in February 2015). The Aristone Defendants are defined as McGrath, AH DB, Aristone, and Castlegrace. *Id.* ¶ 12. Accordingly, the Hanford Complaint alleges that McGrath circulated misrepresentations on behalf of Rocky Aspen, while he was a co-manager of Rocky Aspen. *See id.* ¶ 20. McGrath's attempts to assert that the Wrongful Act only occurred later when Defendants failed to update the offering document, or was not an act taken by McGrath on behalf of Rocky Aspen, are inconsistent with the allegations of the Hanford Complaint. *See* Dkt. No. 175 at 13–29.

The parties dispute whether the February 2015 statements and other Wrongful Acts in connection with the Rocky Aspen Loan constitute "Interrelated Wrongful Acts." *See* Dkt. No. 169 at 18–23; Dkt. No. 175 at 27–30; Dkt. No. 180 at 12–15. However, given the Court's holding regarding the meaning of "Claim" and the "arising out of" or "in any way involving" portion of the exclusion, this issue is immaterial. Whether or not McGrath's other alleged misrepresentations in July 2015 constitute "Interrelated Wrongful Acts" with his alleged misrepresentations in February 2015, they are excluded from coverage because they are part of a "Claim" that arises out of and involves the misrepresentations before Rocky Aspen became a Subsidiary. Considering whether certain misrepresentations within the Claim are interrelated with others would only be relevant if the exclusion were applied "on an allegation-by-allegation

or cause-of-action-by-cause-of-action basis," which the language of the Policy does not permit here. *Daileader*, 670 F. Supp. 3d at 42.[19]

The Policy states that Loss from the entire "Claim" is excluded if the Claim arises out of or in any way involves Wrongful Acts allegedly taken by the Officers and Directors of a Subsidiary prior to that Subsidiary becoming a Subsidiary. Policy D&O Coverage Section C.1.h.

---

[19] It is a close question whether McGrath's alleged February 2015 misstatements and his alleged July 2015 misstatements would qualify as "Interrelated Wrongful Acts" within the meaning of the Policy. *See* Policy D&O Coverage Section B.6.). Courts interpreting similar provisions have held that "[t]o establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a 'sufficient factual nexus.'" *Quanta Lines*, 2009 WL 4884096, at *14; *see Zahler*, 2006 WL 846352, at *7; *Glascoff*, 2014 WL 1876984, at *1. The crucial issue is whether the Wrongful Acts themselves, as opposed to the surrounding facts and circumstances of a particular claim, are factually interrelated. *See Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 311391, at *8–11 (S.D.N.Y. Feb. 2, 2022) ("The critical question is not the nature of the legal allegation but whether it arises out of a single or related set of Wrongful Acts."); *Seneca*, 2004 WL 1145830, at *7 (describing the issue as whether the "wrongs" are factually and legally distinct). Accordingly, where the allegedly wrongful act, policy, or statement in multiple claims is essentially similar, courts have found differences in the surrounding facts and circumstances to be immaterial. *See Nomura*, 45 F.Supp.3d at 373 ("[A]lthough the Underlying Actions allege claims in connection with different offerings, the alleged misstatements in those offering documents are largely identical."); *Seneca*, 2004 WL 1145830, at *10 (holding claims from multiple plaintiffs that the same policy violated antitrust law involved interrelated wrongful acts); *Zurich Am. Ins. Co.*, 230 N.Y.S.3d at 52 (holding claims for negligent supervision of employee who sexually harassed multiple plaintiffs under similar circumstances involved interrelated wrongful acts); *Zunenshine*, 1998 WL 483475, at *5 (holding claims for "virtually identical false statements" made to multiple plaintiffs for similar purposes involved interrelated wrongful acts). On the other hand, if the Wrongful Acts themselves are "factually and legally distinct," *Seneca*, 2004 WL 1145830, at *7, they do not become interrelated simply because they share common parties or context, *see Glascoff*, 2014 WL 1876984, at *7 (holding that employer's failure to investigate allegations of improper conduct against an employee was not interrelated with employer's failure to adequately supervise the same employee with regard to a particular transaction). McGrath's misrepresentations in February 2015 about Rocky Aspen's business prospects plausibly arise from a different factual nexus than his misrepresentations in July 2015 regarding encumbrances to Rocky Aspen's securities, given that the latter misrepresentations concern changes to Rocky Aspen's operating agreement and securities which occurred after February 2015. When courts have found that later misstatements were interrelated with earlier misstatements, the misstatements have generally been "largely identical." *Nomura*, 45 F.Supp.3d at 373; *see Zunenshine*, 1998 WL 483475, at *5 ("virtually identical"); *Zahler*, 2006 WL 846352, at *7 ("the same").

Because the Claim against McGrath here arises out of and involves his February 2015 solicitation of funding on behalf of Rocky Aspen via an allegedly fraudulent offering document, it falls within the exclusion and Scottsdale has no duty to defend.[20]

## II.    The Bankruptcy Demand

McGrath also seeks coverage for the Demand made against him by the Trustee in the Rocky Aspen Bankruptcy.  However, Scottsdale has no duty to defend this Demand because there is no possibility it will result in a covered Loss.[21]

---

[20] Scottsdale argues in the alternative that it is entitled to summary judgment because McGrath failed to provide timely notice of the claim.  Dkt. No. 169 at 23–25; Dkt. No. 180 at 17–21. However, it is undisputed that Watershed timely gave notice of the Claim on November 9, 2016. Dkt. No. 169-12.  The Policy contains an authorization clause stating that "the Parent Company [Watershed] agrees to act on behalf of all Insureds, and the Insureds agree that the Parent Company will act on their behalf, with respect to the giving of all notices to Insurer."  Policy General Terms and Conditions Section G.  In accordance with this provision, after Watershed provided Scottsdale a copy of the Hanford Complaint, Scottsdale responded with a preliminary coverage analysis not only as to Watershed, but as to its officers, RAM 204, McGrath, AH DB, Castlegrace, and Aristone.  Dkt. No. 169-13 at 3.  This analysis asserted that McGrath was not an Insured and disclaimed coverage as to him.  *Id.*  Because Watershed provided notice to Scottsdale in accordance with the Policy and Scottsdale subsequently disclaimed coverage as to McGrath, Scottsdale cannot now argue that it lacked notice of the Claim against McGrath.  *See H. S. Equities, Inc. v. Hartford Acc. & Indem. Co.*, 661 F.2d 264, 270 (2d Cir. 1981) ("It is established that a repudiation of liability by an insurer on the ground that the loss is not covered by the policy operates as a waiver of the notice requirements contained in the policy.").

[21] Scottsdale also argues that the complaints in the adversary proceedings do not allege that McGrath took any wrongful act.  Dkt. No. 169.  But even if the complaint itself does not reveal the possibility of coverage, "the insurer is required 'to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage.'"  *Charter Oak Fire*, 462 F. Supp. 3d at 324 (quoting *Fitzpatrick v. Am. Honda Co.*, 575 N.E.2d 90, 93 (N.Y. 1991)). Though the complaints merely state that "the Debtor," i.e. Rocky Aspen, used the proceeds of the Rocky Aspen Loan to pay loans on which Castlegrace, AH DB, and McGrath were liable, Dkt. No. 169-10 ¶¶ 25–32; Dkt. No. 169-14 ¶¶ 20–32, the Trustee's demand letter, which McGrath tendered to Scottsdale, states that the transfers were made "at McGrath's direction," Dkt. No. 169-16 at 2. Given that the broad definition of Wrongful Act in the Policy includes "any . . . act allegedly committed" by the Insured, the allegation in the demand letter that McGrath directed the transfers is sufficient to show to establish a reasonable possibility that the Trustee's Demand is based on McGrath's Wrongful Acts.

"Loss" is defined to include "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and Costs, Charges, and Expenses[22] incurred by Directors and Officers." Policy D&O Coverage Section B.7. Loss does not include "matters uninsurable under the laws pursuant to which this Policy is construed." *Id.* Under New York law, "the word 'Damages' does not include a claim for restitution of money that was wrongfully obtained by an insured." *Admiral Ins. Co. v. Weitz & Luxenberg, P.C.*, 2002 WL 31409450, at *5 (S.D.N.Y. Oct. 24, 2002); *see Vigilant Ins. Co. v. Credit Suisse First Bos. Corp.*, 782 N.Y.S.2d 19, 20 (1st Dep't 2004) ("The risk of being directed to return improperly acquired funds is not insurable."); *Reliance Grp. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 594 N.Y.S.2d 20, 24 (1st Dep't 1993); *XL Specialty Ins. Co. v. Loral Space & Commc'n, Inc.*, 918 N.Y.S.2d 57, 62 (1st Dep't 2011) ("[T]here is no insurance where an insured is forced to disgorge funds that it acquired wrongfully."); *see also Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 910 (7th Cir. 2001) (collecting authority); *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1082 (N.Y. 2013) (noting that "[a]lthough we have not considered the issue, other courts have held that the risk of being ordered to return ill-gotten gains—disgorgement—is not insurable").[23]

The Trustee's claims against McGrath, Castlegrace, and AH DB seek only to avoid and recover transfers from Rocky Aspen to McGrath and his companies under Section 548(a)(1)(B) of the Bankruptcy Code. Dkt. Nos. 169-10, 169-14, 169-16. "[T]he law of fraudulent conveyance (or 'fraudulent transfer') is obviously based on principles of unjust enrichment and

---

[22] Costs, Charges and Expenses means "reasonable and necessary legal costs, charges, fees, and expenses incurred by any of the Insureds in defending Claims." *Id.* B.3.

[23] The application of this principle turns on substance of the remedy given the particular facts of the case, not the label placed on the remedy. *See Vigilant*, 992 N.E.2d at 1083; *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.* ("*Vigilant II*"), 183 N.E.3d 443, 450 (N.Y. 2021) (holding that penalty labeled as "disgorgement" was compensatory in nature and did not reflect amount of insured's wrongful gains).

associated equitable remedies."  Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).  The remedy for a fraudulent transfer in bankruptcy is simply the "recovery of the avoided transfers," that is, the return of the money fraudulently transferred.  Dkt. No. 169-14; *see* 11 U.S.C. § 550 ("[T]he trustee may recover, for the benefit of the estate, the property transferred.").  The risk that a director or officer will be required to return money erroneously transferred to him is not an insurable loss.  *See In re TransTexas Gas Corp*., 597 F.3d 298, 310 (5th Cir. 2010) (holding that "the return of funds due to a fraudulent transfer is in the nature of restitution" and therefore uninsurable).  Because this is the only remedy sought in the adversary proceedings, McGrath cannot suffer a Loss insurable under the Policy, and Scottsdale has no duty to defend.

Scottsdale seeks a declaratory judgment that 1) there is no coverage for the Demand because no Wrongful Acts were alleged against McGrath in his capacity as a Director or Officer, 2) there is no coverage for the Demand because of the Subsidiary Exclusion, and 3) there is no coverage for the Demand because Defendants did not provide timely notice of the claim.  Dkt. No. 1 ¶¶ 33–41.  The Declaratory Judgment Act "confers a discretion on the courts rather than an absolute right upon the litigant."  *Wilton v. Seven Falls Co*., 515 U.S. 277, 287 (1995).  In deciding whether to issue a declaratory judgment, a court should consider "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co*., 411 F.3d 384, 389 (2d Cir. 2005); *see Admiral Ins. Co. v. Niagara Transformer Corp*., 57 F.4th 85, 96–98 (2d Cir. 2023).  If "a lawsuit has been filed that will necessarily settle the issues for which the declaratory judgment is sought," this "suggests that the declaratory judgment will serve 'no useful purpose.'"  *Amusement Indus., Inc. v. Stern*,

693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010); *see Continuum Grp. LLC v. 666 Performance, LLC*, 2025 WL 1489255, at *2 (S.D.N.Y. May 23, 2025) ("A counterclaim seeking a declaratory judgment may also be dismissed as duplicative if it 'is redundant of a primary claim raised by a party to a lawsuit.'" (citation omitted)); *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 430 (S.D.N.Y. 2021).  A fortiori, if the Court has already decided a primary claim resolving the controversy between the parties, it should not use the declaratory judgment mechanism to issue an advisory opinion on additional legal issues. Because the Court has already held that Scottsdale has no duty to defend McGrath with respect to the Demand, it declines to issue a declaratory judgment that McGrath is not covered for the particular reasons raised by Scottsdale.

However, Scottsdale's declaratory judgment claim is not redundant with regard to coverage for AH DB and Castlegrace.  McGrath's counterclaims for breach of the duty to defend were on behalf of himself only, not AH DB and Castlegrace.  *See* Dkt. No. 14.  AH DB and Castlegrace cannot be covered with regard to the Demand because they were never Subsidiaries of Watershed or Directors or Officers of any Subsidiary, and therefore cannot have been Insureds or committed Wrongful Acts for which coverage would attach.  *See* Dkt. No. 179 ¶¶ 19–22.  The Court will therefore issue a declaratory judgment that Scottsdale has no duty to defend AH DB and Castlegrace for the bankruptcy Demand or related adversary proceedings.

## CONCLUSION

Scottsdale's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  McGrath's motion for summary judgment is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 169, 171, and 174, and to close this case.

SO ORDERED.

Dated: September 2, 2025
     New York, New York

                                 LEWIS J. LIMAN
                         United States District Judge